Albert P. Barker, ISB #2867
Paul L. Arrington, ISB #7198
**BARKER ROSHOLT & SIMPSON LLP**
1010 W. Jefferson, Suite 102
P.O. Box 2139
Boise, Idaho 83701-2139
Telephone: (208) 336-0700
Facsimile: (208) 344-6034
E-mail: apb@idahowaters.com
        pla@idahowaters.com

Terry T. Uhling, ISB #2581
Sheila G. Bush, ISB #3248
**J.R. SIMPLOT COMPANY**
999 Main Street, 13th Floor
P. O. Box 27
Boise, ID  83707-0027
Telephone: (208) 389-7317
Facsimile: (208) 389-7464
E-mail:tuhling@simplot.com
        sheila.bush@simplot.com

*Attorneys for Intervenor, J.R. Simplot Company*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Case No.: 4:10-CV-00004 |
| Plaintiffs, | **J.R. SIMPLOT COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendants. | |
| And | |
| J.R. SIMPLOT COMPANY | |
| Defendant-Intervenors. | |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 2

STANDARDS OF REVIEW ......................................................................................... 2

    I.   Summary Judgment ......................................................................................... 2

    II.  Administrative Procedure Act........................................................................... 2

LEGAL ANALYSIS..................................................................................................... 4

    I.   The BLM Thoroughly Analyzed the Land Exchange Including the *Possibility* of a Gyp-Stack Expansion and, Therefore, did not Violate NEPA................... 4

        A.   The BLM Conducted a Detailed Review of Gyp-Stack Technology and Effectiveness in Evaluating the Potential Environmental Impacts of the Land Exchange. .......................... 5

        B.   The Tribes have Failed to Show that the BLM's Decision to Prepare an EA and Not an EIS was Arbitrary and Capricious. ................................................................. 10

           1.   The Proposed Land Exchange is Not "Highly Controversial." ...................... 11

           2.   The Potential Environmental Impacts of the Land Exchange, Including the Possibility of a Gyp-Stack Expansion are Not "Highly Uncertain" and do Not "Involve Unique or Unknown Risks." ........................ 12

        C.   The Cumulative Impacts of the Land Exchange were Thoroughly Analyzed.................. 13

    II.  There is no FLPMA Violation. ...................................................................... 15

    III.  Since the BLM Complied with the Law, There is No Trust Violation................... 16

    IV.  Simplot Continues to Take Measures to Reduce Impacts Caused by Historical Operations at the Don Plant Which Precludes any Injunctive Relief........................... 17

CONCLUSION........................................................................................................... 19

# TABLE OF AUTHORITIES

## CASE LAW

*American Colloid Co. v. Babbitt*, 145 F.3d 1152 (10th Cir. 1998)......................................................... 3

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) .......................... 11

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982) ...................................... 3

*Center for Bio-Ethical Reform, Inc. v. Los Angeles County*, 533 F.3d 780 (9th Cir. 2008)................. 2

*Cranston v. Clark*, 767 F.2d 1319 (9th Cir. 1985)............................................................................. 3, 9

*Ecology Center v. Castenada*, 562 F.3d 986 (9th Cir. 2009)................................................................ 3

*Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234 (D. Idaho 2005) ...................... 6, 11, 12

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006)...................................................... 17

*Hapner v. Tidwell,* -- F.3d --, 2010 WL 3565255 (9th Cir. Sept. 15, 2010)........................................ 9

*Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008) ...................................................................... 4

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (*en banc*)........................................... 2, 3, 4, 8

*Marsh v. Oregon National Resources Council*, 490 US 360 (1989) ..................................................... 3

*Monsanto v. Geertson Seed Farms*, 130 S.Ct. 2743 (2010) ............................................................... 19

*Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29 (1983) .......................... 4

*Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981) ................................................................................. 16, 17

*Nat. Parks and Cons. Ass'n v. U.S. Dep't of Transp.* 222 F.3d 677 (9th Cir. 2000) ............................. 8

*North Idaho Community Action Network v. Dept. of Trans.*, 545 F.3d 1147 (9th Cir. 2008) .............. 8

*Northwest Env. Adv. v. Nat. Marine Fisheries Serv.*, 460 F.3d 1125 (9th Cir. 2006) ...................... 3, 4

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989)............................................... 4, 8

*Seattle Community Council Federation*, 961 F.2d 829 (9th Cir. 1992).......................................... 9, 10

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) .................................................. 17

*Te-Moak Tribe v. Dept. of Interior*, 608 F.3d 592 (9th Cir. 2010) ......................................... 5, 6, 7, 15

*Tillamook Cty. v. U.S. Army Corps of Engineers*, 288 F.3d 1140 (9th Cir. 2002) ...................... passim

*Western Land Exchange Project v. Bureau of Land Management*, 315 F.Supp.2d 1068 (D. Nevada 2004) .................................................................................................................................................. 6

*Winter v. NRDC*, 129 S.Ct. 365 (2008)............................................................................................. 19

## CONSTITUTIONAL & STATUTORY MATERIAL

5 U.S.C. § 706(2)(A)...................................................................................................... 2

Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*...................................................... 2

## RULES & REGULATIONS

40 C.F.R. § 1501.4(b) .................................................................................................. 10

40 C.F.R. § 1501.4(e) .................................................................................................. 10

40 C.F.R. § 1508.27 ..................................................................................................... 10

*40 C.F.R. § 1508.27(a)* ............................................................................................... 10

40 C.F.R. § 1508.27(b) .......................................................................................... 10, 11

Fed. R. Civ. P. 56(c) ..................................................................................................... 2

# INTRODUCTION

The Shoshone-Bannock Tribes ("Tribes") complain that the Bureau of Land Management ("BLM") failed to examine the cumulative impacts of approving a land exchange with the J.R. Simplot Company ("Simplot").  Under the proposed land exchange, the BLM will transfer land adjacent to an industrial complex, and within a Superfund Site, to Simplot (the "Selected lands") in exchange for an equivalent amount of land now in private hands that provides superior mule deer habitat (the "Offered Lands").

This claim asserts that the BLM ignored the cumulative impacts which might occur if the Selected Lands were used to site a new gyp stack.[1]  The Tribes make no claim that the BLM failed to consider cumulative impacts of any other aspect of the land exchange – just that a "hard look" was not given to the impacts of an expanded gyp stack on the Selected Lands.  The Tribes' argument is not supported by the law or record.  In fact, it is not certain that the Selected Lands will be used for a gyp stack.  Even so, the BLM carefully and thoroughly examined the potential that a gyp stack might be constructed on the Selected Lands.   They thoroughly analyzed the existing science behind liners for gyp stacks and concluded that with a required liner there would not be any significant cumulative impacts.

After carefully considering the *possibility* of a gyp-stack expansion onto the Selected lands in a Final Environmental Assessment ("Final EA"), the BLM issued its Decision Record/Finding of No Significant Impact ("DR/FONSI") – finding that an Environmental Impact Statement ("EIS") was not required and approving the land exchange.  The Final EA and DR/FONSI provided the necessary "hard look" required under the National Environmental

---

[1] "At the Plant, phosphate ore is processed into phosphoric acid using a sulfuric acid process that leaves gypsum (calcium sulfate) and some soluble phosphorus (in combination "phosphogypsum") as the primary waste byproducts.  The waste byproducts also include some heavy metal and low-level radionuclides and other contaminants.  Phosphate ore processing operations have been ongoing since the 1940s.  The byproducts have been accumulated in a large waste pile, known as phosphogypsum stack ("gyp stack") near the Plant." BR 2. This gyp stack, also referred to herein as the "existing gyp stack," has been in place since the 1940's.

**J.R. SIMPLOT COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**                    **1**

Policy Act ("NEPA"), and complied with the Federal Land Management Policy Act ("FLPMA") and the BLM's trust obligations to the Tribes.  Accordingly, the Court should affirm the BLM's decision.

## STATEMENT OF FACTS

Simplot's *Combined Statement of Material Facts in Support of Its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion* ("JRS Statement of Facts"), is filed concurrently herewith.

## STANDARDS OF REVIEW

### I.     Summary Judgment

Summary judgment is appropriate when there is "no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). "When presented with cross-motions for summary judgment, we review each motion for summary judgment separately, giving the nonmoving party for each motion the benefit of all reasonable inferences."  *Center for Bio-Ethical Reform, Inc. v. Los Angeles County*, 533 F.3d 780, 786 (9th Cir. 2008).

### II.     Administrative Procedure Act.

This Court's review of the Final EA and DR/FONSI is governed by the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701, *et seq*.; *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*).  Under the APA, the Court "may set aside only agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *McNair*, 537 F.3d at 987 (citing 5 U.S.C. § 706(2)(A)).  An agency's determination that an EIS is not required is given great deference and may be overturned only if that decision was "arbitrary, capricious or an abuse of discretion."  *Tillamook Cty. v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143 (9th Cir. 2002).

A decision of the Interior Board of Land Appeals ("IBLA") is given a "high level of deference." *Cranston v. Clark*, 767 F.2d 1319, 1322 (9th Cir. 1985).  A court "will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law or not supported by substantial evidence." *American Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 (10th Cir. 1998).

"Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency." *Ecology Center v. Castenada*, 562 F.3d 986, 990 (9th Cir. 2009) (internal quotations omitted).  In fact, a Court can "reject an agency's decision '*only* if the [agency] committed *a clear error of judgment*.'" *Tillamook, supra*, at 1143 (emphasis added).

> The NEPA is a procedural statute intended to ensure environmentally informed decision-making by federal agencies. … The statute is not meant to "mandate particular results" but to provide a process to ensure that federal agencies take a "hard look" at the environmental consequences of proposed acts.  When an agency makes a decision subject to the NEPA's procedural requirements, **"the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive**."

*Id*. at 1143-44 (internal citations omitted) (emphasis added); *see also Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (D.C. Cir. 1982) (A court cannot substitute its judgment as long as the agency's decision is "fully informed and well considered").

The Court's review is further tempered by the deference owed to the agencies' technical decisions.  *Marsh v. Oregon National Resources Council*, 490 US 360, 378 (1989); *Castenada*, 562 F.3d at 992; *McNair*, 537 F.3d at 988 (it is "not a proper role for" the court to "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses… chooses among scientific studies… and orders the agency to explain every possible scientific uncertainty"); *Northwest Env. Adv. v. Nat. Marine Fisheries Serv*., 460 F.3d 1125, 1135 (9th Cir. 2006) (the court "is not to substitute [its] 'judgment for that of the agency concerning the wisdom or

prudence of a proposed action'"").  "Were we to grant less deference to the agency, we would be ignoring the APA's arbitrary and capricious standard of review." *McNair, supra* at 992.  An agency action may be found arbitrary and capricious *only* if the agency (1) relied on factors that Congress had not intended it to consider; (2) entirely failed to consider an important aspect of the problem; or (3) if the decision is counter to the evidence or implausible.  *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## LEGAL ANALYSIS

**I.      The BLM Thoroughly Analyzed the Land Exchange Including the *Possibility* of a Gyp-Stack Expansion and, Therefore, did not Violate NEPA.**

NEPA requires that an agency take a "hard look" at the environmental impacts of the proposed action.  *McNair,* 537 F.3d at 1000.  "NEPA itself does not mandate particular results, but simply prescribes the necessary process," and requires that the final decision be informed. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989); *Northwest Env. Adv.,* 460 F.3d at 1133.  A court cannot overturn an agency's decision, "even if, as an original matter, a court might find contrary views more persuasive."  *McNair, supra* at 1000; *Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008) (The Court will not "second-guess methodological choices made by an agency in its area of expertise").

Here, the Tribes cannot meet their burden to overturn either the agency or IBLA decisions.  They cannot show that the BLM relied on factors not intended by Congress, that the BLM entirely failed to consider important aspects of the problem or that the BLM's decision is contrary to the evidence.  *See Motor Vehicle Mfrs. Assn., supra.*  Indeed, the Tribes do not even raise these arguments.

The record demonstrates, however, that the BLM was aware that Simplot *might* construct an expansion of the gyp stack on the selected lands, and thoroughly analyzed the potential impacts.

> The EA assumed the likelihood that Simplot would construct a new or expanded gyp stack and specifically addressed the likely effects of a possible new gyp stack to the extent they can be analyzed at this point without a specific development plan.

BR 6.

### A. The BLM Conducted a Detailed Review of Gyp-Stack Technology and Effectiveness in Evaluating the Potential Environmental Impacts of the Land Exchange.

The Tribes principally argue that because the Selected Lands are in a National Priority List ("NPL" or "Superfund") site and because a gyp stack might be placed on that property in the future, the BLM must prepare an EIS to analyze the cumulative impacts of the exchange. Tribes Memo p.12. Yet, there is no hard and fast rule that an EIS is required for any activity in or near a Superfund Site. Simplot seeks the Selected Lands for "a buffer area and possible future gypsum storage area." BR 316. Although the Tribes argued below that the BLM should have considered the technical details and engineering for a gyp-stack expansion, *see* BR 2329, 2362, 2380 & 2383, that argument is not raised here. Instead, the Tribes argue that the mitigation measures (i.e. the liner) are too vague to be analyzed.

The Tribes rely on the Ninth Circuit's recent decision in *Te-Moak Tribe v. Dept. of Interior*, 608 F.3d 592 (9th Cir. 2010), for the proposition that generalized description of risk is inadequate to demonstrate a hard look. Yet, *Te-Moak* actually supports the BLM's decision here. There, the Te-Moak Tribe challenged an EA for a mineral exploration project. The Tribe argued that the EA violated NEPA because it "approved all three phases of" the exploration project "without knowing the precise locations of the project's activities, such as drill sites,

access roads, and support facilities." *Id.* at 599.  Some of this information would not be known until exploration commenced and the location of the mineral deposits was better understood.  *Id.*

The Ninth Circuit rejected the Te-Moak Tribe's position, holding that the BLM may approve a project whose details are uncertain, if the agency imposes effective mitigation measures.  *Id.* at 600.  Since "the BLM imposed effective avoidance and mitigation measures to protect Western Shoshone cultural resources from impacts," *id.* at 600-01, "the BLM did not violate NEPA," *id.* at 601.  "An agency's decision to forego preparation of an EIS may be justified, even in the presence of adverse environmental impacts, if the agency adopts mitigation measures in response to identified impacts." *Tillamook, supra* at 1144.  *Accord*, *Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234 (D. Idaho 2005) (affirming an EA for an exploration project, and reviewing mitigation measures).[2]

In *Te-Moak*, the precise location of the drilling sites, roads and support facilities was unknown.  Likewise, the precise location and configuration of a possible gyp stack on the Selected Lands is unknown.  BR 316 & 535.  Nevertheless, the BLM identified specific mitigation measures, including a liner and air quality permits, and examined the effectiveness of these mitigation measures in similar operations.  BR 337-41.  The BLM thoroughly analyzed the use of liners in the phosphate industry along with the potential impacts that would result from a gyp-stack expansion incorporating a liner.  *Id.*  These liners have been used in the mining industry since "the late 1980's," BR 1873, and the EPA has "collected information on the design and application of liners at mine sites" since 1986, BR 1879.

---

[2] The Tribes also rely on *Western Land Exchange Project v. Bureau of Land Management*, 315 F.Supp.2d 1068 (D. Nevada 2004).  In that case, the court found that the BLM erred in failing to consider any mitigation measures in the Final EA.  Rather, "BLM agreed to participate in development of a" monitoring and mitigation plan.  *Id.* at 1093.  The court found that this "unwritten, untested, and unsupported monitoring plan in the face of unknown and possibly significant environmental impacts does not excuse its decision to forego an EIS." *Id.* at 1094.  In this case, however, the agency experts recognized that "Liner technology for gyp stacks is fairly mature and has proven to work well." BR 339.

The BLM considered a lined gyp stack in Rock Springs, Wyoming (BR 538, 539, 549 & 599), another one at an Idaho facility operated by Agrium (BR 337-41 & 1791), and information from the Florida gyp-stack program (BR 536 & 2016), which is the largest in the United States "and [has] the most gyp-waste stacks (twenty or more)," BR 338.

>    Use of liners at the Rock Springs facility has ***prevented releases of contaminants and orthophosphorus to groundwater*** as far as known according to the stack engineer.  Wyoming DEQ staff have corroborated that the liner appears to work well in the stack and that ***no violations of any groundwater or surface water standards have occurred***.

BR 338 (emphasis added).  Furthermore:

>    Florida Department of Environmental Protection ("DEP") indicated that lined gyp stacks that are properly designed, constructed ***do not generally have any ground water issues associated with them***.  ***Liner technology for gyp stacks is fairly mature and has proven to work well***. … Overall, it was reported by DEP that the Florida facilities comply with surface water standards.  A stack in Idaho would be less challenging to properly manage surface water as Pocatello, Idaho area gets 12" of annual precipitation as opposed to 50" or more per year in Florida.

BR 339 (emphasis added).  Based on this review, the BLM concluded that a "new gyp stack" that incorporates "a liner, internal drainage, and proper water management would have little or no seepage or transport of contaminants from phosphogypsum waste into shallow ground water." BR 340.  The Tribes cite no information to the contrary!

In *Te-Moak*, the Court held that the BLM could balance the uncertainties through "effective avoidance and mitigation measures."  Here, the BLM's analysis confirmed that any gyp-stack expansion will be subject to state and federal regulation, BR 337-38, and that "it is almost certain that a liner would be proposed and required" for any gyp-stack expansion.  BR 339.  The Tribes have not demonstrated that this scientific review was unsound, and they certainly cannot overcome the substantial deference owed to the agencies' technical conclusions.

*McNair*, 537 F.3d at 988.  The Tribes' argument that the BLM considered only "vague, speculative mitigation measures" is simply not correct.

The fact that the precise engineering of the liner is unknown is irrelevant.  The Ninth Circuit has held that, while an agency is "required to develop the proposed mitigation measure 'to a reasonable degree,' it [is] ***not required to develop a complete mitigation plan*** detailing the 'precise nature … of the mitigation measures' ***nor were the measures required to 'completely compensate for adverse environmental impacts***.'"  *Tillamook*, *supra* at 1144 (citation omitted) (emphasis added); *Robertson*, 490 U.S. at 353 ("[I]t would be inconsistent with NEPA's reliance on procedural mechanisms – as opposed to substantive, result-based standards – to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act"); *North Idaho Community Action Network v. Dept. of Trans*., 545 F.3d 1147, 1157 (9th Cir. 2008) ("detailed analysis of the impacts … and mitigation measures to minimize these impacts was more than sufficient to meet NEPA's requirements"); *Nat. Parks and Cons. Ass'n v. U.S. Dep't of Transp.* 222 F.3d 677, 681 n.4 (9th Cir. 2000) (mitigation plans "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements").

In *Tillamook*, the Ninth Circuit affirmed an agency's decision to prepare an EA and FONSI for a reservoir expansion project.  228 F.3d 1140.  The plaintiffs argued that the agency should have prepared an EIS and that the EA failed to discuss mitigation measures to "prevent erosion at wetland erosion sites and compensate for wetland loss caused by reservoir expansion." *Id*. at 1144.  The Court rejected these arguments and affirmed the EA and FONSI.  The Court held that an EA was sufficient "even in the presence of averse environmental impacts, if the agency adopts mitigation measures in response to identified impacts." *Id*. at 1144.  The Court further held that the agency's discussion of mitigation was sufficient and that "it was not

required to develop a complete mitigation plan detailing the 'precise nature … of the mitigation measures.'" *Id.*; *see also Seattle Community Council Federation*, 961 F.2d 829 (9th Cir. 1992) (affirming an EA and FONSI addressing changes in flight patterns at the Seattle-Tacoma International Airport).

*Hapner v. Tidwell,* -- F.3d --, 2010 WL 3565255 (9th Cir. Sept. 15, 2010), involved a challenge to a timber project.  The plaintiffs argued that the Forest Service selection of the woody debris restoration method to mitigate for soil disturbance was "merely speculative," unfunded and, therefore, arbitrary and capricious.  The court rejected that challenge because the woody debris restoration method was effective and cost efficient, and hence not arbitrary or capricious.  Here the agency experts have concluded that the liner technology is feasible and well established in the field.  Accordingly, the agency's decision to rely on that mitigation measure is neither arbitrary nor capricious.

On top of this careful agency analysis, the IBLA thoroughly reviewed the BLM's decision and held that the BLM's analysis was sufficient.  BR 6-11.  (The "EA assumed the likelihood that Simplot would construct a new or expanded gyp stack and specifically addressed the likely effects of a possible new gyp stack to the extent they can be analyzed at this point without a specific development plan").  This second level of review by the IBLA is itself subject to deferential review. *Cranston v. Clark, supra.*

The BLM's analysis of the possible gyp-stack expansion meets NEPA's requirements.  Without any certain plans for expansion, the BLM must review the possible environmental impacts and incorporate avoidance and mitigation measures.  NEPA does not require the BLM to engineer a liner.   The analysis was thorough and complete and the DR/FONSI should be affirmed.

**J.R. SIMPLOT COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY**          **9**
**JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**B.    The Tribes have Failed to Show that the BLM's Decision to Prepare an EA and Not an EIS was Arbitrary and Capricious.**

The Tribes assert that the BLM's failure to prepare an EIS violates NEPA.  Tribes' Memo at 11-14.  This claim is not supported by the law or the record.  An agency may prepare an EA to analyze the impacts of a proposed action and to determine whether or not an EIS should be performed.  40 C.F.R. § 1501.4(b).  If the agency determines that an EIS is not required, the agency may issue a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1501.4(e); *Seattle Community Council Federation*, 961 F.2d at 832.  Here, the BLM prepared an EA analyzing the impacts of the land exchange – including the impacts and mitigation requirements for a potential gyp-stack expansion – and determined that an EIS was not required.  This decision may *only* be reversed if the Court finds that the BLM acted arbitrarily or capriciously in making this decision. *Tillamook, supra.*

In determining whether an EIS should be prepared, the agency must consider whether or not the proposed action is "significant" – which is defined in terms of "context" and "intensity." 40 C.F.R. § 1508.27.  "Context" includes a consideration of "society as a whole (human, national), the affected region, the affected interests, and the locality."  *Id*. at § 1508.27(a).[3] "Intensity," refers to a list of ten factors that "should be considered in evaluating intensity."  *Id*. at § 1508.27(b).  Of those ten factors, the Tribes cite only three to support their claims:

> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
>
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
> …

---

[3] "Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant."  40 C.F.R. § 1508.27(a).

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

*Id*. (quoted in Tribes' Memo at 10-11).

### 1.      The Proposed Land Exchange is Not "Highly Controversial."

The Tribes have not shown that the land exchange is "highly controversial" – indeed, they fail to allege any controversy, as that term has been defined by the courts.  "[H]ighly controversial" means more "than the existence of opposition to a use."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  As this Court stated in *Greater Yellowstone Coalition*, 392 F.Supp.2d at 1243, "the existence of opposition to a use, however, does not render an action controversial."  Rather, a project is "highly controversial… when there is 'a substantial dispute [about] the size, nature, or effect of the major Federal action.'"  *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.  In *Reese*, this Court held that there was no controversy when "there is no evidence that any agency has any objection to the exploratory project."  392 F.Supp.2d at 1243.

In this case, the Tribes have only shown an "opposition to a use."  The record is devoid of any evidence demonstrating a "substantial dispute" about the project.  There is no scientific evidence that liners are not appropriate mitigation measures for gyp stacks or that the air quality permit would not be protective of human health and the environment.  On the other hand, the record shows that there is support from the City of Pocatello, the Idaho Department of Fish and Game *and the Tribes* for the acquisition of the Offered Lands and their "superior resources."  *See* BR 606 (Pocatello); BR 618 & 629 (Idaho Department of Fish and Game); BR 2328 (the Tribes).  The EPA "is in support of the proposed land exchange" because it will give Simplot "ownership

and control of this property [and] will facilitate the implementation of any institutional controls identified in the EPA [EMF ROD]." BR 619.[4] "BLM policy encourages transferring liability and associated management concerns of contaminated lands to potentially responsible parties (PRP)", such as Simplot in this case, "whenever possible." BR 331. The City of Pocatello considers this land exchange to be a "win-win proposition for the citizens of Pocatello." BR 606.

In short, "the record does not show evidence of a controversy beyond [the Tribes'] opposition, *which is not enough by itself to render the project controversial*." *Reese*, 392 F.Supp.2d at 1243 (emphasis added). An EA was appropriate.

> **2.     The Potential Environmental Impacts of the Land Exchange, Including the Possibility of a Gyp-Stack Expansion are Not "Highly Uncertain" and do Not "Involve Unique or Unknown Risks."**

The Tribes also failed to show that impacts on the "human environment are highly uncertain or involve unique or unknown risks." The record shows that the BLM thoroughly considered the impacts of the lands exchange – including the *possibility* that the selected lands would be used for a gyp-stack expansion.

During the NEPA process, the Tribes demanded that Simplot be required to incorporate a liner on any future gyp-stack expansion onto the Selected Lands. BR 2329 ("The following proposed mitigation strategies are suggested for either federal or state agencies for future implementation of the proponent: 1. Require the proponent to install and maintain a liner, based upon the best available technology"); BR 2362 (asserting that the EA should be amended to include "the requirement for Simplot to install an impermeable liner – one that is EPA-approved that and [sic] meets meets [sic] RCRA or CERCLA standards"); BR 2380 & 2383 (The Final EA

---

[4] The EPA did submit comments expressing concerns over the draft EA. BR 531. However, the BLM addressed those concerns. BR 444.

should consider "the installation of liners at both the existing site, and the proposed expanded site to prevent groundwater contamination").

Given the more than twenty years of experience with liners, the history of the use of liners in Idaho, Wyoming and Florida, the documented success rate of the liners and the BLM's analysis, the impacts of a possible gyp-stack expansion are not "highly uncertain" and the risks involved are not "unique or unknown."  As the IBLA recognized:

> The current state of the art and the techniques and experience with other lined gyp stacks described in the EA – including the Simplot gyp stack at Rock Springs – uniformly indicate that liners are effective in preventing ground water contamination. ***The Tribe has offered no evidence or analysis to contradict or refute the facts and analysis in the EA and in the Decision***.

BR 11 (emphasis added).  The Tribes still fail to offer any scientific evidence to refute the BLM's reasoned decision that liners are effective mitigation measures for gyp stacks.  Hence, the BLM's decision to prepare an EA was not arbitrary and capricious.

### C.    The Cumulative Impacts of the Land Exchange were Thoroughly Analyzed.

Next, the Tribes assert that there was "no detailed, quantified, consideration of past projects, reasonably foreseeable future projects, or analysis of how such projects might relate to the proponent's own stated purpose of the exchange," Tribes' Memo at  12, and that the BLM failed to consider impacts to water quality, *id*. at 12-13.  The Tribes do not identify what other projects were not considered, other than the incorrect claim that a gyp stack on the Selected Lands was not considered.

The BLM did consider the possibility that the Selected Lands would be used for a gyp-stack expansion.  BR 337-41.  The Final EA includes a discussion of existing gyp stacks and the EMF Superfund Site and cleanup efforts.  BR 319, 321-23 & 335-36.  The BLM addressed the Ecological Risk Assessment for the EMF Site, BR 1201, the EPA EMF Superfund Site Record

of Decision, BR 1222, the Preliminary Site Characterization Summary of the Remedial

Investigation and Feasibly Study, BR 1235, and the Off-Site Surficial Soil Contaminant Plots,

BR 1240.

The record also includes additional documents from the CERCLA process, including a

EMF Contamination Site Description, BR 1390, a Public Health Assessment – EMF

Contamination prepared by the Idaho Department of Environmental Quality ("IDEQ"), BR 1506,

and the CERCLA Consent Decree, BR 1659.

The BLM also discusses groundwater and the potential impacts associated with the land

exchange.  BR 322, 323-24 & 332.  The Final EA concludes that the "exchange of lands would

not impact water quality but activities allowed on them after the exchange could potentially

improve or degrade the water quality. … Development would be subject to the Clean Water Act

and other applicable water quality laws and regulations."  BR 332.  The Final EA cites to an

IDEQ report discussing water quality on the EMF Superfund Site lands.  BR 336; *see also* BR

1552.  Contrary to the Tribe's assertion (p. 13 of Tribes' memo), "groundwater in the area of the

EMF Superfund site has been extensively studied."  BR 324.

The Final EA thoroughly analyzes the *potential* for an expansion of the gyp stack onto

the selected lands – i.e. "reasonably foreseeable" activities.  In the largest single section of the

Final EA, the BLM discusses the *possibility* that the gyp stack would be expanded onto the

selected lands and the potential impacts from such an expansion.  BR 337-41.[5]  The BLM

recognized that "it is possible that placement of a new gyp stack on the Federal lands could result

in additional impacts to those already existing at the EMF site if the design, construction,

---

[5] The Tribes assert that the cumulative impacts analysis is merely comprised of "one-half of one page" of the Final EA.  Tribes' Memo at 13.  This assertion ignores the nearly four pages of discussion and analysis regarding the "issues of concern and possible future impacts" wherein the BLM discussed the *possibility* that Simplot will expand the gyp stack onto the selected lands.

operation, final reclamation, and closure of the stack are not carefully assessed and implemented." BR 337. This analysis of cumulative impacts in the Final EA is thorough and complies with the procedural requirements of NEPA.

The Tribes' rely on a statement in *Te-Moak, supra*, that plaintiff "must show only the potential for cumulative impact" in order to meet its burden. 608 F.3d at 605. Still, they must show some potential; there is no evidence in the record to suggest that there is even a potential impact (that has not been analyzed and mitigated) from the lined gyp stack. In *Te-Moak* the court reversed an EA approving a mine exploration project because the EA failed to consider the cumulative impacts of the exploration project in association with separate *existing* plans to develop two additional mineral deposits in the same area. *Id*. at 605-06. There are no such existing plans for two new industrial facilities near the Don Plant.

The BLM's decision to prepare an EA and FONSI is not arbitrary and capricious and should be affirmed.

## II.    There is no FLPMA Violation.

The Tribes base their entire FLPMA argument on the faulty conclusion that the BLM violated NEPA. Since the BLM did not violate NEPA, there is no FLPMA violation.

Furthermore, the record clearly demonstrates the land exchange is in the public interest. The City of Pocatello, BR 606, Idaho Department of Fish and Game, BR 618 & 629, and even the Tribes, BR 2328, have all expressed support for the acquisition of the Offered Lands due to their superior resources. These Offered Lands were "previously identified as desired land parcels." BR 316. Consolidating ownership of the Offered Lands will allow BLM to incorporate "these parcels into the public land management for the intensive recreational use

occurring in the Blackrock and Caddy Canyon areas as described in the Recreation Management Activity Plan." *Id.*

EPA supports the land exchange as a means of giving Simplot "ownership and control" of certain EMF Superfund Site property as a means to "facilitate the implementation of any institutional controls identified in the EPA [EMF ROD]." BR 619; *see also* BR 316 (The exchange will also allow Simplot to "fulfill" its "need to implement legally enforceable controls on the contaminated land as directed by Section 10.1.5.2 of the EPA's Record of Decision for the EMF Superfund Site"). Finally, the "BLM policy encourages transferring liability and associated management concerns of contaminated lands to potentially responsible parties (PRP)", such as Simplot in this case, "whenever possible." BR. 331. This land exchange clearly is in the public interest and should be affirmed.

### III.     Since the BLM Complied with the Law, There is No Trust Violation

The Tribes also rely solely on their NEPA argument to support the claim that the BLM breached its trust responsibility. *Tribes Br*. at 14. Where there is no other violation of federal law there is no breach of trust.

The BLM's trust obligations to the Tribes were discharged by complying with the law. In *Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981), a Tribe challenged EPA's designation of certain off-reservation land as "Class I" under the Clean Air Act PSD regulations. The Tribe alleged that the designation impaired its ability to conduct its coal mining activities. The Court rejected the Tribe's arguments:

> [I]n specifically finding that the redesignation would not, under the law as it stood at that time, have any effect on strip mining, the EPA adequately addressed the Crow's interest in this regard. That the assumption may have turned out as a result of subsequent events to have been wrong does not affect the answer to the question of whether the fiduciary responsibilities were fulfilled in the first place.

*Id*.

More recently, the Ninth Circuit has confirmed that an agency's obligations to a Tribe, relative to off-reservation lands (as here), are discharged by complying with the law:

> [U]nless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes. This is the law of the circuit, and this is the law [the courts] must follow.

*Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir. 2006); *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary responsibility exists, it is a limited one only").

Since there was no NEPA or FLPMA violation, there was no trust violation and the BLM should be affirmed.

## IV. Simplot Continues to Take Measures to Reduce Impacts Caused by Historical Operations at the Don Plant Which Precludes any Injunctive Relief

The Tribes assert that the BLM ignored the cumulative impacts of potential gyp-stack construction on the Offered Lands. The facts do not support this claim. Significantly, Simplot has committed to and has taken steps to significantly improve water quality around the Don Plant and remediate for impacts caused by past practices. These protective measures have reduced phosphorus concentrations in the Portneuf River by 50%. *Declaration of Alan L. Prouty* at ¶ 11 ("*Prouty Dec.*"). Simplot is now installing a liner at the existing gyp stack. As a result, phosphorous loading to the Portneuf River will decrease by 50% by December 31, 2013 and 94% by 2021. *Id*.

As the BLM recognized in the Final EA, the existing gyp stack was "constructed in the late 1940s" and current technologies allow for gyp stacks to be operated with minimal impacts on water quality.  BR 337-41.  The EA contemplated a liner and Simplot committed to line any future expansion of a gyp stack onto the offered lands.  BR 339; 535 & 458-59.  More recently, on July 6, 2010, Simplot executed an amendment to the CERCLA Consent Decree that ensures any gyp-stack expansion onto the Selected Land must include a liner.  *Prouty Dec.* ¶¶ 6-7 & Exs. A & B.

Simplot has committed to implementing state-of-the-art protections at the existing facilities.  Pursuant to the CERCLA Consent Decree, Simplot has installed monitoring and extraction wells near the Don Plant.  *Id.* at ¶ 5.  These wells remove contaminated water from the aquifer that is then used in the production process.  *Id.*  The amendment to the CERCLA Consent Decree further addresses phosphorus and arsenic issues at the Don Plant.  *Id.* at Ex. A.

On top of Simplot's prior commitment to line any future expansion of the gyp stack, the Consent Decree requires Simplot to line the existing gyp stack.  *Id.* at ¶ 7.  In 2009, Simplot constructed a lined "decant pond to capture and store process water from the Don Plant."  *Id.* at ¶ 8.  This decant pond, which will capture water from the existing gyp stack, is the first phase of lining the existing gyp stack.  *Id.*  On May 17, 2010, Simplot received approval from the IDEQ to begin installation a state-of-the-art liner, similar to those analyzed in the Final EA, on the existing gyp stack.  *Id.* at ¶ 9 & Ex. C.  Simplot began installing the liner on July 30, 2010 and expects to be completed with construction by 2015.  *Id.* at ¶ 10; *see also Id.* at Ex. D (photographs of liner installation in process).

These measures will reduce phosphorous loading to the Portneuf River as much as 94% by 2021.  *Id.* ¶ 11.  The Tribes' concerns about pre-existing water quality are being addressed by

Simplot, IDEQ, the BLM and EPA.  It makes no practical sense to require the agencies to restudy the cumulative impacts, based on the Tribes' theory that the mitigation promises were too ephemeral to be real, when those mitigation measures are now enforceable obligations through the action of Simplot and the Agencies.  Under these circumstances, no injunction is necessary or appropriate.  *Monsanto v. Geertson Seed Farms*, 130 S.Ct. 2743, 2748 (2010) ("thus, the existence of a NEPA violation does not create a presumption that injunctive is available and should be granted absent unusual circumstances"); *Winter v. NRDC*, 129 S.Ct. 365 (2008).

## CONCLUSION

The cumulative impacts of a possible expansion of the gyp stack onto the Selected Lands may never happen.  If a gyp stack is placed on these lands, a liner will be required. The scientific analysis supports the agency's determination that there will be no significant environmental impacts from such an expansion, because any such impacts will be mitigated by the liner and other environmental laws.  The BLM decision is not arbitrary and capricious and should be upheld.

DATED this 8th day of October, 2010.

By:       /S/

            Albert P. Barker
            Paul L. Arrington

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 8th day of October, 2010, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Ayako Sato (ayako.sato@usdoj.gov)
David H. Maguire (Maguire@maguire-kress.com)
Katherine G. Strong (kgstrong@gmail.com)
Matthew S. Echo Hawk (matt@echohawk.com)
Paul C. Echo Hawk (paul@echohawk.com)

/S/
Albert P. Barker