IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
CHARLES FINDLAY, Assistant Chief
Natural Resources Section
AYAKO SATO, Trial Attorney
ayako.sato@usdoj.gov
DC Bar #: 977669
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
(P) (202) 305-0239
(F) (202) 305-0506

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | ) ) ) | Case No. 4:10-CV-4 |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **RESPONSE TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED ON AUGUST 24, 2010 AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF THE INTERIOR; AND UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| J.R. SIMPLOT COMPANY, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ................................... 6

I.      National Environmental Policy Act ........................................................ 6

II.     Federal Land Policy and Management Act .............................................. 7

STANDARD OF REVIEW ................................................................................. 8

ARGUMENT ....................................................................................................... 9

I.      The BLM Took a "Hard Look" at the Environmental Impacts ............. 9

      A.     The BLM Appropriately Concluded That An EIS Was
           Unnecessary ................................................................................ 9

      B.     BLM's Cumulative Impacts Analysis is Sufficient ................. 13

II.     Plaintiff's FLPMA and Breach of Trust Responsibility Claims Fail .... 17

      A.     The BLM's Public Interest Determination Is In Compliance
           With FLPMA .......................................................................... 17

      B.     Federal Defendants Have Not Breached Any Trust
           Responsibility ......................................................................... 19

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

FEDERAL CASES

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) .......................................................... 9

*Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293 (9th Cir. 1981) ................................ 17

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council Inc.*, 462 U.S. 87 (1983) .............................. 8

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,

   524 F.3d 938 (9th Cir. 2008) ................................................................................. 16

*Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212

   (D.D.C. 2005) ...................................................................................................... 15

*Churchill County v. Norton*, 276 F.3d 1060 (9th Cir. 2001) ....................................... 9

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ....................... 9

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ......................................... 8

*Coal. on Sensible Transp., Inc. v. Dole*, 826 F. 2d 60 (D.C. Cir. 1987) ...................... 13

*Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009) .......................................... 15

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ............................................. 9

*Friends of Endangered Species v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) ................... 12

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989

   (9th Cir. 1993) ..................................................................................................... 12

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006) .............................. 19

*Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972) ..................................................... 14

*Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170 (9th Cir. 2000) ............... 10

*Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ............. 14

*Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754 (9th Cir. 1996) ............ 10

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................. 7, 13, 17

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) ........ 15

ii

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ................................................................. 13

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002) ........................... 16

*Lands Council v. McNair*, 537 F.3d 981(9th Cir. 2008) ........................................... 9, 11

*League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, No. 09-35094, 2010 WL 3194619 (9th Cir. Aug. 13, 2010) ............................................................. 14

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211 (9th Cir. 2008) ....................................................................................... 15

*Lodge Tower Condo. Ass'n v. Lodge Prop., Inc.*, 880 F. Supp. 1370 (D. Colo. 1995), aff'd, 85 F.3d 476 (10th Cir. 1996) ............................................................................................. 8

*Lower Alloways Creek Tp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732 (3d Cir. 1982) ........... 10

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) ...................................... 7

*Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419 (2d Cir. 1977) ................. 10

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569 (9th Cir. 1998) ........ 19

*N. Ala. Envtl. Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) .................................... 16

*Nat'l Coal Ass'n v. Hodel*, 675 F. Supp. 1231(D. Mont. 1987) .................................... 18

*Nat'l Coal Ass'n v. Hodel*, 825 F.2d 523 (D.C. Cir. 1987) .......................................... 18

*Occidental Eng'g Co. v. INS*, 753 F.2d 766 (9th Cir. 1985) ...................................... 8, 9

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, No. 05-35931, 2010 WL 3398386 (9th Cir. Aug. 31, 2010)............................................................................................................ 18

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............................... 6

*Rohnert Park Citizens to Enforce CEQA v. U.S. Dep't of Transp.*, No. 09-15750, 2010 WL 2640376 (9th Cir. July 1, 2010) ................................................................................... 16

*Shasta Res. Council v. U.S. Dep't of Interior*, 629 F. Supp. 2d 1045 (E.D. Cal. 2009)............... 15

*Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140 (9th Cir. 2002) ....................... 10

*Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000) ...... 12

*Wetlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004) ............................. 12

FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 706 .................................................................................................... 8, 9

16 U.S.C. § 470 ................................................................................................... 2, 3

42 U.S.C. §§ 4321 *et seq.* .................................................................................... 6

42 U.S.C. § 4332(C) .............................................................................................. 7

43 U.S.C. §§ 1701 *et seq.* .................................................................................... 7

43 U.S.C. § 1701(a)(8) .......................................................................................... 7

43 U.S.C. § 1716(a) ............................................................................................. 18

36 C.F.R. § 254.3 ................................................................................................ 18

36 C.F.R. § 254.3(b)(1) .................................................................................... 8, 18

36 C.F.R. § 800.8(a)(1) ...................................................................................... 12

40 C.F.R. § 1501.3 ................................................................................................ 7

40 C.F.R. § 1501.4(b) ........................................................................................... 7

40 C.F.R. § 1508.7 ......................................................................................... 14, 17

40 C.F.R. § 1508.9(a) ............................................................................................ 7


FEDERAL REGISTER

46 Fed. Reg. 18,026 (1981) ................................................................................... 7

## INTRODUCTION

Plaintiff challenges the Bureau of Land Management's decision to authorize the Blackrock Land Exchange.  Through the land exchange, the Bureau of Land Management ("BLM") will acquire land located in the Blackrock and Caddy Canyon areas located east/southeast of Pocatello, Idaho within Bannock County ("offered lands").  This area contains important deer winter range habitat and has been intensively used for recreational activities including off-highway vehicle use, mountain biking, hiking, and horseback riding.  By contrast, the lands that will move out of Federal ownership ("selected lands") are adjacent to an industrial area that has received fluoride and heavy metal contamination via air-borne emissions from the phosphate processing facilities and are part of a larger contaminated area known as the Eastern Michaud Flat Superfund Site.  The BLM evaluated the potential environmental impacts by preparing a Pre-decisional Environmental Assessment and a Final Environmental Assessment ("EA").  The BLM also actively solicited Plaintiff's input through meetings, correspondence, and through other actions before, during, and after the preparation of the EAs.  Ultimately, the BLM determined that the land exchange will be in the public interest and will not result in any significant environmental impacts.  Although Plaintiff may be opposed to the land exchange, Plaintiff has failed to show that the BLM was arbitrary or capricious in approving the land exchange.  For the reasons stated below, this Court should deny Plaintiff's motion for summary judgment and grant Federal Defendants' cross motion for summary judgment.

## FACTUAL BACKGROUND

On April 29, 1994, J.R. Simplot Company ("Simplot") submitted a land exchange proposal to BLM to acquire public lands adjacent to its Don Fertilizer Plant for a buffer area and

possible future gypsum storage area ("gyp-stack").[1]  BR 316.  BLM and Simplot discussed the

land exchange and BLM began preparation of an EA in 1996, but the matter did not proceed.

BR 316.  In 2002, Simplot renewed discussions with BLM.  *Id.*

On October 4, 2006, the BLM directly solicited comments from Plaintiff on the Pre-

decisional EA.  S*ee* BR 2345-46.  The Pre-decisional EA analyzed the impacts of the land

exchange to air quality, cultural resources, hazardous and solid wastes, water quality, wetlands

and riparian zones, Tribal treaty rights, wildlife and migratory birds, availability of access and

need to reserve access to lands, recreational use, existing and potential land uses, vegetation and

soils, and economic and social values.  *See, e.g.*, BR 357-71.

The Pre-decisional EA also examined the potential impacts of the land exchange, and the

BLM concluded that the environmental impacts would be insignificant.  BR 371.  The BLM

found that the air quality impacts are generally attributable to other operational facilities, not the

land exchange or the existing or potential gyp-stacks.  BR 357.  The BLM also determined that

water quality impacts would be minimal because the land exchange itself has no water quality

impacts and the potential development of a new gyp-stack would be subject to the Clean Water

Act and other applicable water quality laws and regulations.  BR 367.  Although the BLM

acknowledged that cultural resource site 10PR666 and 10BK212 would be adversely impacted,

impacts would be mitigated through site documentation efforts as agreed to by the Idaho State

Historic Preservation Office ("SHPO"), the BLM, and Simplot through the execution of a

Memorandum of Agreement ("MOA") under the National Historic Preservation Act, 16 U.S.C. §

---

[1] Phosphogypsum is the solid waste by-product of phosphorus fertilizer manufacture, which is often stored in gyp-stacks.  *See* BR 335.

470.[2]   BR 367.   The BLM ensured that potential impacts to the cultural resources will be mitigated by requiring the land exchange to be contingent upon the execution of the MOA by all parties.  BR 372.

After receiving a copy of the Pre-decisional EA, on April 3, 2007, Plaintiff provided its comments.  *See* BR 2324-34.  Although Plaintiff acknowledged that the offered lands support important deer habitat and the preservation of that area is generally supported by Plaintiff, Plaintiff expressed concern about the land exchange.  *See* BR 2328 ("However, acquiring the Blackrock land parcel, which contains valuable terrestrial and aquatic resources, would benefit the wildlife populations and habitat . . . [and] the Tribes are supportive of protecting wildlife populations and their habitats, as Treaty rights are related by the natural and cultural resources that support those rights.").  Specifically, Plaintiff expressed concern about the BLM's analysis of the direct, indirect, and cumulative effects of the land exchange.  *See* BR 2324-25.  The letter also suggested that the BLM explore mitigation strategies such as installing and maintaining a liner for any future gyp-stack.  BR 2329.  On May 8, 2007, Plaintiff was provided an additional copy of the Pre-decisional EA, which incorporated the concerns raised in Plaintiff's April 3rd letter.  *See* BR 2323.  On June 19, 2007, Plaintiff submitted a follow-up letter and stated "[i]f the BLM chooses to proceed with the land exchange, mitigation must be developed for the Tribes' losses of public lands."  BR 2321.

In December 2007, the BLM issued the Final EA.  BR 313-49.  In response to Plaintiff's comments, BR 2323, 2320, the BLM investigated the issues further and significantly expanded its discussion of environmental impacts, including reasonably foreseeable and indirect impacts,

---

[2] Although the Pre-decisional and Final EA identified two cultural resource sites and stated that mitigation would apply to both sites, the MOA only addresses cultural resource site 10PR666 because a shovel test report indicated that 10BK212 is not eligible for listing on the National Register of Historic Places.  *See* BR 2019.

in the Final EA.  *Compare* BR 370-371 *with* BR 334-341.  Regarding air quality impacts, BLM explained that "[t]he majority of impacts to air and surrounding lands have occurred primarily from the industrial plants, not the proponent's existing gyp-stack."  BR 336; *see also* BR 550 (further documenting BLM's investigation of potential causes for existing air quality impacts). Moreover, Idaho Department of Environmental Quality ("IDEQ") required Agrium, a company that had also recently constructed a gyp-stack, to obtain an approval for a Permit to Construct to address fugitive particulate emissions.  BR 337; *see also* BR 548 (further documenting the BLM's investigation of Agrium's gyp-stack and impacts on air quality).  Thus, the BLM concluded that any air quality impacts from the potential expansion of the gyp-stack would be insignificant.  BR 340.

Regarding groundwater impacts, the BLM determined that no significant impacts would result.  *Id.*  As described in the Final EA, unlike Simplot's earlier gyp-stacks that were constructed in the 1940s, properly designed, state-of-the-art gyp-stacks are constructed with liners and are unlikely to release hazardous materials.  *See* BR 337-38.  The BLM reasonably concluded that Simplot's gyp-stack would utilize a liner because: (1) Simplot has constructed liners for all of its gyp-stacks since its construction of the Rock Springs, Wyoming fertilizer facility in the 1980s;  (2) standard industry practices within the last 15-20 years have almost universally prescribed infiltration barriers and liners to gyp-stacks; (3) Simplot provided a written commitment to the BLM that it would, in fact, install a synthetic liner; and (4) Agrium's gyp-stack plans consisted of a triple-layer liner, and IDEQ was instrumental in requiring certain improvements to Agrium's proposal through the IDEQ's permitting process in obtaining a Permit to Construct.  *See* BR 338-39.  Additionally, the Final EA noted that groundwater impacts

4

are regulated by Federal and state laws.  BR 337; *see also* BR 528-30 (letter from IDEQ detailing requirements under Idaho's Ground Water Quality Rule).

The BLM found that the land exchange would be in the public interest for a variety of reasons.  *See* BR 307-9.  In the Final EA, the BLM documented the positive effects that the land exchange would have on important mule deer winter range.  Based on counts conducted in 2003, the BLM found that the offered lands provide important deer winter range and supports considerably more deer than the selected lands, BR 325, and that the land exchange would allow the BLM to expand the overall public land acreage of important deer winter range in the Blackrock Canyon area by approximately 667 acres, BR 332.  Acquiring the offered lands would also allow the BLM to manage those areas for recreational uses consistent with the immediately adjacent public lands.  BR 333.  These lands are included in the Chinese Peak/Blackrock Canyon Resource Activity Plan.  *See generally* BR 1083-1200.  The Resource Activity Plan provides management direction to implement travel management prescriptions, develop recreation facilities, acquire public access, and pursue land acquisitions on adjacent private lands.  *See id.* This area receives a considerably higher level of recreational visitor use than the selected lands. BR 333.   If the offered lands are not acquired, the BLM would be unable secure legal access into Caddy Canyon, as well as close or rehabilitate undesignated trails and roads or manage the recreational use and travel of off-road vehicles.  *Id.*  The land exchange would also have a positive impact on the economic and social values of the local area because it would allow the continued operation of the Don Fertilizer Plant with minimal interruption.  BR 334.  Simplot employs approximately 560 people at the Don Fertilizer Plant and the Smoky Canyon Mine and contributes significantly to the local economy through the payment of salaries and purchases of local goods and services within the state of Idaho.  BR 327.  Based on its analysis, the BLM

5

concluded that the land exchange would not result in significant environmental impacts and issued a Decision Record and Finding of No Significant Impact ("FONSI") on December 21, 2007.  BR 307-12.

Subsequently, two events occurred.  First, IDEQ and Simplot entered into a voluntary consent decree on April 11, 2008, in which Simplot has agreed to employ a liner in any new proposed gyp-stack.  *See* BR 458-59.  Second, in October and November 2009, the BLM, the Idaho SHPO, and Simplot signed an MOA that ensures mitigation measures will be employed to minimize any adverse impacts to the cultural resource site 10PR666.  BR 3031-34.  The documentation of cultural site 10PR666 will be accomplished through the taking of photographs, collection of oral histories through audio recordings and transcripts of those recordings, and a traveling interpretive exhibit.  BR 3032.

On October 3, 2008, Plaintiff filed a Notice of Appeal of the BLM's final decision to the Interior Board of Land Appeals ("IBLA").  On June 5, 2009, the IBLA affirmed the BLM's final decision.  BR 1-17.  On January 6, 2010, Plaintiff filed a Complaint for declaratory and injunctive relief with this Court challenging the BLM's final decision.

## STATUTORY AND REGULATORY BACKGROUND

### I.   National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, serves the dual purpose of informing agency decision makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA, however, does not mandate particular results or impose substantive environmental obligations

upon federal agencies.  *Id.* at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action."); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

To fulfill NEPA's dual purposes, an agency must prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  In order to determine whether an EIS is necessary, an agency may prepare an EA.  40 C.F.R. §§ 1501.4(b), 1501.3.  An EA is intended to be a "concise public document" that "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(a) & (b); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,037 (1981) ("Since the EA is a concise document, it should not contain long descriptions or detailed data which the agency may have gathered.").

## II. Federal Land Policy and Management Act

Unlike NEPA, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, places substantive requirements on an agency.  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070-71 (9th Cir. 2002).  In enacting FLPMA, Congress declared that it is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  43 U.S.C. § 1701(a)(8).

Land exchanges involving lands within the BLM's jurisdiction are governed by FLPMA's Section 206, which authorizes the Secretary of the Interior to approve a land exchange where "the public interest will be well served by making that exchange."  *Id.* § 1716(a).  The Secretary is to consider "better Federal land management and the needs of State and local people,

including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife." *Id.* When considering the public interest, FLPMA's implementing regulations further instruct the agency to consider the "protection of fish and wildlife habitats, cultural resources, watersheds, and wilderness and aesthetic values; enhancement of recreation opportunities and public access; [and] consolidation of lands and/or interests in lands . . . for more logical and efficient management and development." 36 C.F.R. § 254.3(b)(1). Although FLPMA requires the BLM to weigh these various factors, there is no requirement that the BLM give weight to one factor over another. *Lodge Tower Condo. Ass'n v. Lodge Prop., Inc.*, 880 F. Supp. 1370, 1380 (D. Colo. 1995), *aff'd*, 85 F.3d 476 (10th Cir. 1996) ("Section 1716(a) requires merely that the agency consider and weigh the factors . . . [i]t does not give the factors any particular priority, nor does it require the agency to do so.").

## STANDARD OF REVIEW

Claims brought under NEPA are governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Because NEPA does not contain provisions for judicial review, claims are governed by the APA's standard of review. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-6 (9th Cir. 2004). Under the APA, a reviewing court must satisfy itself that an agency's decision is not "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 1206 (citations and quotation omitted). As long as the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the administrative action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council Inc.*, 462 U.S. 87, 105 (1983).

Where a party challenges a federal agency action under the APA, summary disposition of the legal challenge is appropriate. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir.

1985) ("[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.").   In record review cases such as this one, this Court's role in resolving such actions is limited to applying "the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." [3]   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Although an agency's actions under NEPA and FLPMA are subject to careful judicial scrutiny, courts must also be mindful to defer to agency expertise, particularly with respect to technical matters within the purview of the agency.  *See Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004).  In areas requiring a "high level of technical expertise," courts are required to defer to an agency's determinations.  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citations omitted) (en banc) (courts "are to be 'most deferential' when the agency is 'making predictions, within its [area of] special expertise, at the frontiers of science.'").  The Supreme Court has noted that, "the ultimate standard of review is a narrow one," and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## ARGUMENT

### I.   The BLM Took a "Hard Look" at the Environmental Impacts

NEPA's essential requirement is that an agency take a "hard look" at the environmental consequences of its proposed actions.  *See Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th

---

[3] Plaintiff devotes a significant portion of its brief discussing Rule 56.  Dkt. No. 38 (Pl.'s Mem.) at 5-7.  Although Federal Defendants agree with Plaintiff that summary judgment is appropriate in this case, s*ee* Pl.'s Mem. at 5, Federal Defendants do not agree that this Court's role is to resolve factual disputes, *see id.* at 7.  *Occidental Eng'g*, 753 F.2d at 769 ("[The district] court is not required to resolve any facts in a review of an administrative proceeding. . . . [T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").

Cir. 2001).  Thus, a court's role is to look at whether the agency took a "hard look" at those environmental consequences and cannot substitute its judgment for that of the agency.  *See Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) ("[T]he only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive….") (citation omitted).  A "rule of reason" test is applied to determine whether an agency's environmental analysis contained "a reasonably thorough discussion of the significant aspects of probable environmental consequences."  *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (citations and quotations omitted).  For the reasons stated below, the BLM took the requisite "hard look" at the environmental consequences of the proposed action and appropriately concluded that an EIS was unnecessary.

## A.    The BLM Appropriately Concluded That An EIS Was Unnecessary

Plaintiff alleges that the BLM violated NEPA by not preparing an EIS when the BLM "produced an EA and FONSI which would allow a large expansion of activities known to impact many aspects of the environment," but if fails to explain much less point to a single reference in the administrative record to support this allegation.  Pls.' Mem. at 11.  Plaintiff has the burden of proof to establish that the BLM's NEPA analysis is inadequate.  *See Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419, 422 (2d Cir. 1977) ("The burden of proof is on the challenging plaintiff to establish that the EIS was inadequate . . . .").  Here, Plaintiff has failed to meet that burden by simply alleging a broad-brush NEPA violation without more.  *See Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996) ("Plaintiffs have advanced no proof why this [NEPA] decision is arbitrary and capricious, as is their burden.")); *Lower Alloways Creek Tp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 747 (3d

Cir. 1982) (finding that plaintiff failed to meet its burden of proof "merely by baldly asserting, without supporting proof or evidence, that significant effects will accompany a proposed action").   On the contrary, and as explained below, the BLM reasonably concluded that environmental impacts would be insignificant and appropriately issued a FONSI.

First, Plaintiff's premise that any potential gyp-stack is "known" to cause significant environmental impacts is based on the erroneous assumption that any gyp-stack will be constructed in the same manner as the existing gyp-stacks at the Don Fertilizer Plant.  *See* BR 2379 ("The existing Simplot-owned Gypsum Stacks, and the contaminated groundwater underlying them, are one of the major reasons for the U.S. EPA designating this site as a CERCLA (Superfund) site; and hence we do not believe the [sic] that National Environmental Policy Act (NEPA) is served by any proposal to expand the gypsum stacks into the valleys south of their present site."); BR 2380.  However, the EA notes that the existing gyp-stacks at the Don Fertilizer Plant were constructed in the late 1940s without any liners.  BR 336, 1391 ("On-site groundwater has been affected by releases from *unlined* waste management facilities at both FMC and Simplot.") (emphasis added).  Unlike those gyp-stacks, the BLM reasonably expected that any new gyp-stack constructed on the selected lands would be lined and, therefore, impacts to groundwater would be controlled and in compliance with groundwater standards.  *See* BR 340; *see supra* at 4-5.[4]

Second, the BLM sufficiently explained why impacts, particularly to air quality and groundwater, did not rise to the level of significance, *see supra* at 4-5, and the agency's determination should be afforded deference.  *See Lands Council*, 537 F.3d at 993.  Not only did

---

[4] Indeed, Simplot has agreed under the voluntary consent decree with IDEQ to construct a liner for any proposed gyp-stack.  *See* BR 458-459.  A lined gyp-stack is what Plaintiff had advocated for.  *See* BR 2323, 2321.

the BLM provide explanation, it conducted further investigation after receiving comments on the Pre-decisional EA, *see* BR 536, 537, 596-97, and expanded various sections of the Final EA, including the indirect impacts analysis, to address concerns raised by Plaintiff, BR 2323, 2320. This extensive engagement with Plaintiff during the NEPA process and responsiveness to Plaintiff's concerns is indicative of the BLM's "hard look" at the environmental consequences of the land exchange.[5]  *See Wetlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 874 (9th Cir. 2004) (finding that Interior's level of public engagement and response to public comments compelling factors in determining that the agency took a "hard look" at the environmental consequences).

Third, adverse impacts to cultural resources will be mitigated.[6]  Mitigation measures may eliminate the need for the preparation of an EIS when adverse environmental impacts have been reduced below the level of significance.   *See Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 987 (9th Cir. 1985); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993).  When mitigation measures are conditioned on future events, as is the case here, they may render a project's impact insignificant even when the specifics of such measures have not been fully developed at the time of NEPA review.   In *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000), the Ninth Circuit

---

[5] The BLM engaged the Tribe at different points in the NEPA process to solicit comments regarding various aspects of the proposed action.  *See* BR 2018 (scheduling a meeting with Plaintiff to discuss cultural resources); BR 2320 (documenting government-to-government meeting held in July 2007 resulting in expanded discussion of environmental impacts in the Final EA); BR 2323 (documenting government-to-government meeting held on March 8, 2007 to discuss land exchange proposal); BR 2341-46 (e-mail exchange between Plaintiff and the BLM regarding discussion of Best Management Practices for gyp-stack); BR 2365 (scheduling a meeting with Plaintiff in response to request for government-to-government consultation to discuss the Pre-decisional EA).

[6] Even if adverse impacts were not mitigated, a finding of adverse effect on a historical property does not automatically trigger an EIS.  *See* 36 C.F.R. § 800.8(a)(1) ("A finding of adverse effect on a historic property does not necessarily require an EIS under NEPA.").

found that the Corps complied with NEPA when it issued a FONSI even though the EA relied upon an incomplete mitigation plan because the Corps placed special conditions on the challenged permits preventing any commencement of work until the mitigation plan was approved by the Corps.  222 F.3d at 1121.  Just as in *Wetlands Action Network*, the BLM discussed mitigation measures in the EA as they applied to cultural impacts and conditioned the land exchange on the execution of the MOA.  BR 341.  Additionally, the BLM has actively engaged the Tribe in the development of these mitigation measures before, during, and after the NEPA analysis as documented in the record.  BR 2372, 2392, 2395, 3029, 3039, 3044-45, 3046, 3048, 3059-60, 3091, 3092-93, 3066-67, 3133, and 3134.  Accordingly, it is inaccurate for Plaintiff to contend that impacts on cultural resources were not evaluated.

In sum, the BLM sufficiently discussed the impacts of the proposed action, including impacts to air quality, groundwater quality, and cultural resources, and Plaintiff's general grievance over the EA does not overcome this.

### B.    BLM's Cumulative Impacts Analysis is Sufficient

While, an EA is meant to be a "concise" document as explained above, it must contain a cumulative impacts analysis.  *See Kern*, 284 F.3d at 1076.  Because an agency's determination of the cumulative impacts of a proposed action "involves an almost endless series of judgment calls," *Coal. on Sensible Transp., Inc. v. Dole*, 826 F. 2d 60, 66 (D.C. Cir. 1987), the scope and nature of the cumulative impacts analysis must be left to the discretion of the agency, *Kleppe v. Sierra*, 427 U.S. 390, 412-14 (1976) (The scope and nature of the cumulative impacts analysis, "including the extent of the interrelationship among proposed actions . . . requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.").  As explained below, the BLM's cumulative impacts analysis is sufficient.

13

First, Plaintiff highlights the existing contamination on the selected lands and contends that "[g]iven these most basic facts, the BLM should have fully examined the incremental, cumulative impacts. . . ."  Pls.' Mem. at 12.  Plaintiff's focus on present conditions is misplaced.  Although the present state of the selected lands is important in the overall cumulative impacts analysis, it is only one part of the inquiry.  An agency is required to assess the incremental impact of the proposed action *when added* to past, present, and reasonably foreseeable impacts.  *See* 40 C.F.R. § 1508.7 (defining "cumulative impact" as "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."); *see also Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) ("NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project *together with* all past, present and reasonably foreseeable future actions.") (emphasis added); *Hanly v. Kleindienst*, 471 F.2d 823, 830-31 (2d Cir. 1972).  Because Plaintiff has not adequately demonstrated how the proposed action, when added to past impacts, rises to the level of significance, Plaintiff's cumulative impact claim fails.

Second, Plaintiff's allegation that the EA contains no discussion of "past projects, reasonably foreseeable future projects, or analysis of how such projects might relate to [Simplot's] stated purpose of the exchange" is inaccurate.  Pl.'s Mem. at 12.  NEPA does not require that an EA enumerate all possible past impacts.  The Ninth Circuit has recently clarified the level of detail necessary to describe past impacts in a cumulative impacts analysis and affirmed the practice of applying an "aggregate effects" approach in analyzing past actions.  *See League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, No. 09-35094, 2010 WL 3194619, at *11 (9th Cir. Aug. 13, 2010).  In *League of Wilderness Defenders*, the court found that the Forest Service's cumulative impacts analysis did not violate NEPA even

14

though the EIS did not provide detailed, quantitative information on past impacts. *Id.* The court noted that recent Ninth Circuit decisions have embraced the aggregate effects approach "which does not necessarily require specific time, place, and scale data" and the court held that this approach "is not plainly erroneous or inconsistent with NEPA." *Id.* (citing *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211 (9th Cir. 2008), *Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009)). Similarly, here, the EA does not enumerate or disclose detailed information about each and every past action, but the EA describes the aggregate effects of those actions, particularly those actions that have led to the present conditions at the Superfund Site. *See* BR 321-23 (discussing the elevated levels of heavy metals on the selected lands and the potential effects of site-related contamination); BR 321 (discussing the level of airborne fluoride contaminants resulting from an existing cooling tower); BR 335-36 (discussing existing air quality and groundwater impacts and hazardous waste contamination on selected lands).[7] The cumulative impacts section goes on to describe how the land exchange and any new gyp-stack would add to those impacts at the Superfund Site, and BLM concluded that "[i]mpacts from a new gyp-stack would not likely add significantly to existing water, air, and other impacts at the EMF site and Fort Hall Indian reservation. As previously discussed [in other sections of the EA], best management practices employed

---

[7] Although the EA has a separate cumulative impacts section, other sections of the EA help to inform the cumulative impacts analysis. *See Shasta Res. Council v. U.S. Dep't of Interior*, 629 F. Supp. 2d 1045, 1063 (E.D. Cal. 2009) ("[T]he court does not restrict its review of the EA's site-specific cumulative-impact analysis to [the cumulative impacts] portion of the EA; the section titled 'Proposed Action-Environmental Consequences' also provides site-specific information as to the foreseeable 'incremental impact' of the land exchange, and consistent with *Klamath-Siskiyou*, the courts looks to the substance of the information provided, not merely to how it is labeled or where it is categorized.") (citing *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)); *see also Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 218.

currently at the proponent's existing gyp-stack would likely be incorporated into any new stack constructed in the future on the Federal lands."  BR 341.

Nor is the BLM's cumulative impacts analysis deficient because it did not include more detail on potential future actions.  NEPA does not require the BLM to consider in its cumulative impacts analysis future actions that are too remote or speculative.  *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1124 (9th Cir. 2002) (finding that the Forest Service adequately evaluated cumulative impacts and was not required to analyze potential cumulative effects that are "too speculative"); *see also N. Ala. Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006) (defining a "reasonably foreseeable action" to include proposed actions and actions that are "not too speculative" such as press releases and Notices of Intent); *Rohnert Park Citizens to Enforce CEQA v. U.S. Dep't of Transp.*, No. 09-15750, 2010 WL 2640376, at *1 (9th Cir. July 1, 2010) ("A NEPA document's failure to analyze unknown environmental effects of reasonably foreseeable future actions does not render its cumulative impacts analysis arbitrary or capricious.").  The BLM is required, however, to consider "reasonably foreseeable future actions."  40 C.F.R. § 1508.7.  Here, Plaintiff has not pointed to any specific future action that the BLM neglected to consider.  *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955-56 (9th Cir. 2008) (finding that agency adequately considered cumulative impacts of the project and noting that plaintiff "has pointed to no past, present, or reasonably foreseeable future projects" that the agency should have considered).

Finally, Plaintiff the BLM's cumulative impacts analysis rests on its assessment that any future gyp-stack will be lined.  Pl.'s Mem. at 13.  Plaintiff claims that this is a fatal flaw in the EA because the cumulative impacts analysis is based on "possible effects and vague, speculative mitigation possibilities."  *Id.*  This is wrong.  The BLM reasonably assumed that any proposed

16

gyp-stack would be lined as explained above, see supra at 4-5, and demonstrated the limited impacts stemming from similarly lined gyp-stacks, *see id*.  And far from being "possible" or "speculative," Simplot and IDEQ executed a voluntary consent decree whereby Simplot has agreed that any proposed gyp-stack shall be lined.  BR 451-64.

In sum, Plaintiff has failed to meet its burden in demonstrating that the BLM cumulative impacts analysis is flawed.

## II.  Plaintiff's FLPMA and Breach of Trust Responsibility Claims Fail

Plaintiff devotes only two sentences to an explanation of its FLPMA and breach of trust claims.  Pl.'s Mem. at 14. This cursory treatment of the claims fails to meet the high standard necessary for Plaintiff to prevail.  *See Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981) ("A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data.") (citations omitted).

### A.       The BLM's Public Interest Determination Is In Compliance With FLPMA

Without any support, Plaintiff contends that a failure to comply with NEPA automatically results in a FLPMA violation.  Pl.'s Mem. at 14.  Even assuming that the BLM violated NEPA, which it did not, it would not necessarily follow that the BLM violated FLPMA.  *See Kern*, 284 F.3d at 1070-71; *see also Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, No. 05-35931, 2010 WL 3398386, at *6 (9th Cir. Aug. 31, 2010) ("[W]e have characterized the rights and obligations [NEPA] creates as fundamentally unlike those of substantive land management statutes like the FLPMA.") (quotations and citations omitted).

Plaintiff's sole FLPMA allegation posits that the BLM violated FLPMA's public interest determination because BLM violated NEPA. Pl.'s Mem. at 14.  Plaintiff's argument is baseless. FLPMA allows the Secretary to exchange land "where the Secretary [] determines that the public

interest will be well served by making that exchange . . . ."  43 U.S.C. § 1716(a).  In making a public interest determination, the Secretary must give full consideration to various resource needs and values, and can only execute the exchange if the objectives served in acquiring the offered lands are equal to or exceeds the resource values and the public objectives served by retaining the selected lands.  *See id.*; 36 C.F.R. § 254.3.  The Decision Record gives detailed explanation supporting the Secretary's finding that the land exchange is in the public interest.  *See supra* at 3.  For example, the BLM explained that the offered land contains important deer winter range and areas that are used heavily for on-going recreational activities.  BR 307.  Acquiring these lands would allow the BLM to manage these important resource values.  *Id.*  Moreover, the BLM sought to dispose of the selected lands to allow Simplot to "[c]onsolidate ownership patterns to improve efficiencies and management of existing phosphate operation facilities," BR 316, which is one of the factors to consider in making a determination of public interest under FLPMA's implementing regulations, *see* 36 C.F.R. § 254.3(b)(1).  Although the Decision Record acknowledges that the exchange will result in a net loss of 52 acres of public on which the Tribe's treaty rights could be exercised, the decisionmaker determined that "the superior resources acquired outweighs the net loss in acreage for the tribes to use for their tribal treaty rights."  BR 308.  Because the BLM's public interest determination is well-reasoned and supported by the substantial evidence in the record, this court should not second-guess its conclusion.  *See Nat'l Coal Ass'n v. Hodel*, 825 F.2d 523, 532 (D.C. Cir. 1987) ("The Secretary's public interest determination is one involving a variety of factors, the relative weights of which are left in his discretion.  We will not second-guess his conclusion that the Teton exchange, even after considering potential anticompetitive effects, was in the public interest."); *see also Nat'l Coal Ass'n v. Hodel*, 675 F. Supp. 1231, 1244-45 (D. Mont. 1987)

(finding that the agency's public interest determination adequately addressed the pros and cons of the various concerns and thus "[a]t best, the Court can criticize only the form of the Secretary's analysis," not the substance).

### B.      Federal Defendants Have Not Breached Any Trust Responsibility

Although the BLM is sensitive to the Tribe's concerns regarding the BLM's trust responsibilities, Plaintiff's claim that the BLM failed to comply with and enforce unspecified environmental statutes and therefore somehow breached trust responsibilities to Plaintiff, *see* Pl.'s Mem. at 14, is not supported by law. *See Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006); *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 574 (9th Cir. 1998). *Gros Ventre Tribe v. United States*, is instructive. In *Gros Ventre*, various Indian tribes alleged that the government failed to consider tribal interests in approving and permitting certain mining operations and thus, violated its trust obligations to the tribes. 469 F.3d at 811. The court rejected this argument and noted that any failure to consider tribal interests in the approval and permitting process "is no different from [claims] which might be brought under the generally applicable environmental laws available to any other affected landowner, subject to the same statutory limitations." *Id.* Rejecting the notion that the government owed a specific trust duty, the court instead found that the government's obligation is to comply with applicable regulations and statutes. *See id.* at 810 ("[T]he government's general trust obligation is discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes.") (quotations and citations omitted). Here, neither NEPA nor FLPMA is aimed at specifically protecting Indian tribal interests, and more significantly has complied with NEPA and FLPMA. Accordingly, BLM fully discharged its general trust obligation to Plaintiff.

19

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that their cross-motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied.

Respectfully submitted on this 8th day of October, 2010,

> IGNACIA S. MORENO
> Assistant Attorney General
> United States Department of Justice
> Environment and Natural Resources Division
> CHARLES FINDLAY, Assistant Chief
>
> /s/ *Ayako Sato*
> AYAKO SATO, Trial Attorney
> Environment and Natural Resources Division
> Natural Resources Section
> Ben Franklin Station, P.O. Box 663
> Washington, D.C. 20044-0663
> Tel: (202) 305-0239
> Fax: (202) 305-0506
>
> Attorneys for Defendants

20

**CERTIFICATE OF SERVICE**

I certify that on October 8, 2010, I electronically filed the foregoing with the Clerk of the U.S. District Court of Idaho using the CM/ECF system, which will send a Notice of Electronic filing to the counsel of record.


/s/ Ayako Sato

AYAKO SATO