Paul C. Echo Hawk (ISB # 5802)
Matthew S. Echo Hawk (ISB # 7048)
ECHO HAWK LAW OFFICES
505 Pershing Avenue
P.O. Box 6119
Pocatello, Idaho 83205-6119
Telephone: (208) 478-1624
Facsimile: (208) 478-1670
Email: paul@echohawk.com
Email: matt@echohawk.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Case No.: 4:10-CV-4-BLW |
| Plaintiff, | |
| vs. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; AND UNITED STATES BUREAU OF LAND MANAGEMENT, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO J.R. SIMPLOT COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants, | |
| And | |
| J.R. SIMPLOT COMPANY | |
| Defendants-Intervenors, | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................2

TABLE OF AUTHORITIES ................................................................................................3

ARGUMENT .........................................................................................................................4

    I. STANDARD OF REVIEW ..........................................................................................4

        A. Administrative Procedure Act ...............................................................................4

    II. VIOLATION OF NEPA .............................................................................................5

        A. Hard Look Requirement .........................................................................................5

        B. Arbitrary and Capricious ........................................................................................6

            1. Highly Controversial .......................................................................................8

            2. Cumulative Impacts .........................................................................................8

    III. VIOLATION OF FLPMA ........................................................................................12

    IV. BREACH OF TRUST RESPONSIBILITY .............................................................13

CONCLUSION .....................................................................................................................16

# TABLE OF AUTHORITIES

## CASE LAW

*Anderson v. Evans*, 350 F.3d 815 (9th Cir. 2003)..................................................................8

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ......................9

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) ............................................................... 16

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)............................................................... 12

*Friends of Se.'s Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998)............................................. 13

*Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234 (D. Idaho 2005) ............................. 9

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006)......................................... 15, 17

*Joint Bd. of Control v. United States*, 862 F.2d 195 (9th Cir. 1988) ............................................ 15

*Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008) ................................................. 6

*Nance v. E.P.A.*, 645 F.2d 701 (9th Cir. 1981) ................................................................ 14, 15

*Navajo Tribe of Indians v. U. S.*, 624 F.2d 981 (Ct. Cl. May 28, 1980)......................................... 16

*Northwest Environmental v. National Marine*, 460 F.3d 1125 (9th Cir. 2006).......................... 6, 7

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) ....................... 8

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)....................................... 6, 12

*Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) .. 15, 16, 17

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ............................................................. 12

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) ............................................. 6, 9

*Te-Moak Tribe v. USDOI*, 608 F.3d 592 (9th Cir. 2010)................................................. passim

*Tillamook County v. U.S. Army Corps of Engineers*, 288 F.3d 1140 (9th Cir. 2002) ................ 5, 6

*W. Land Exch. Project v. U.S. Bureau of Land Mgmt.*, 315 F. Supp. 2d 1068 (D. Nev. 2004) ..... 8

## RULES & REGULATIONS

40 C.F.R. §1508.7 ..................................................................................................7

INTRODUCTION

COMES NOW Plaintiff Shoshone-Bannock Tribes ("Tribes") by and through their attorneys of record, EchoHawk Law Offices, and submits this memorandum in opposition to J.R. Simplot Company's Motion for Summary Judgment.

ARGUMENT

I. STANDARD OF REVIEW

   *A. Administrative Procedure Act*

Defendant cites to the case of *Tillamook County* for the proposition that an agency's determination that an EIS is not required is given great deference and may be overturned only if that decision was "arbitrary, capricious or an abuse of discretion." *Def.'s Memo at pg. 2*. However, *Tillamook County* does not state that great deference is given to an agency's determination that an EIS is not required. That case states that the court reviews an administrative agency's decision not to prepare an EIS to assure that the decision was not arbitrary and capricious and to determine whether the "agency has taken the requisite hard look at the environmental consequences of its proposed action" and has conducted a "reasoned evaluation of the relevant factors." *Tillamook Cty. v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143 (9th Cir. 2002). Additionally, that case states that NEPA requires those agencies to prepare an environmental impact statement for major federal actions "significantly affecting the quality of the human environment." *Id.*

Additionally, Defendants cite to the *Tillamook* case for three different propositions. One, an agency's determination may be overturned only if that decision was "arbitrary, capricious or an abuse of discretion." *Def.'s Memo at pg. 2*. Two, that a Court can "reject an agency's decision '**only** if the [agency] committed **a clear error of judgment**.'" *Def.'s Memo at pg. 3*

(emphasis in original). Three, the decision may <u>only</u> be reversed if the Court finds that the BLM acted arbitrarily or capriciously in making this decision. *Def.'s Memo at pg. 2* (emphasis in original). The second is the only one that is found in the case. *Tillamook*, 288 F.3d at 1143.

## II. VIOLATION OF NEPA

### A. Hard Look Requirement

Defendant's reliance on *McNair* is incorrect. NEPA does require that an agency take a "hard look" at the environmental impacts of the proposed action. *Def.'s Memo at pg. 4*. However, *McNair* continues, "NEPA requires agencies to take a "hard look" at the environmental consequences of their actions by preparing an EIS for each "major Federal action significantly affecting the quality of the human environment."" If the Plaintiff has alleged facts, which, if true, show that the proposed project may significantly degrade some human environmental factor, the standard for preparing an EIS has been met. *Sierra Club v. US Forest Service*, 843 F.2d 1190, 1193 (9th Cir. 1988). A determination that significant effects on the human environment will in fact occur is not essential. *Id.* If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared. *Id.*

The *Methow Valley* case was also discussing the requirement of an EIS by a government agency. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). Defendants cite to two other cases regarding the "hard look" requirement of NEPA, *Northwest Environmental v. National Marine*, 460 F.3d 1125 (9th Cir. 2006), and *Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008). Both of these cases, however, deal with the required hard look being met and deference given to agencies after the production of an EIS. *Northwest Environmental* states, "We review an environmental impact statement "to determine whether it

contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences'" of a particular project." *Northwest Environmental*, 460 F.3d at 1133. It continues, "Alternatively phrased, we review agency decisions to ensure that "the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Id*.

Additionally, Defendant argues that *Lands Council* supports the proposition that the Court will not "second-guess methodological choices made by an agency in its area of expertise." This is correct. However, that case dealt with the Forest Service's decision concerning logging, an area that is squarely within the area of expertise of the Forest Service. The BLM's area of expertise is not the environmental consequences of a proposed gypsum stack. Nor is it the potential cumulative impacts from the addition of another gypsum stack next to a gypsum stack that is a current source of contamination. Contamination to such a degree that the site was classified as a superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act (Superfund) and on the National Priority List. BR 321.

*B. Arbitrary and Capricious*

Defendants argue that the Tribes have not raised arguments regarding the arbitrary and capricious standard to overturn an agency decision. *Def's Memo at pg. 4*. Specifically, Defendant argues that the Tribes cannot show that the BLM relied on factors not intended by Congress, that the BLM entirely failed to consider important aspects of the problem or that the BLM's decision is contrary to the evidence. *Id*. This is incorrect. The BLM has failed to consider important aspects of the problem. The facts show that the purpose of the land exchange, at least on Simplot's part, was for expansion of the gypsum stack. BR 381, 413. Additionally, the BLM's decision is contrary to the evidence. The initial correspondence

regarding the land exchange was for the purpose of expansion of the gypsum stack. BR 2417. The initial draft EA also listed the purpose as expansion of the gypsum stack. BR 413. In fact, the first two draft EA's list as their purpose the expansion of the gypsum stack. BR 381, 413.

Defendants also argue that the agency must consider whether or not the proposed action is "significant", which is defined in terms of "context" and "intensity," in determining whether an EIS should be prepared. *Def.s Memo, pg. 10.* Defendants do not provide any argument regarding "context" when discussing whether or not the proposed action is "significant," other than stating that it includes a consideration of "society as a whole (human, national), the affected region, the affected interests, and the locality. The context in this case is that the current site is a Superfund site and on the National Priority List. It cannot be stated enough that the current gyp-stack is the current cause of contamination to the surrounding area. Allowing Defendant to build another gyp-stack, even with current liner technology, without considering fully the cumulative impacts that will be caused is a violation of NEPA and should not be allowed. Plaintiff does not have to demonstrate that significant effects will occur but rather that there are substantial questions whether the project may have a significant effect of on the environment. *Western Land Exchange Project v. U.S. Bureau of Land Management*, 315 F.Supp.2d 1068, 1087, quoting *Anderson v. Evans*, 350 F.3d 815, 831 (9th Cir. 2003).

Defendant does provide argument regarding some of the factors that are considered in evaluating intensity. The 9th Circuit has held that one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. US Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2004). Considering the context of this decision of the BLM, and the factors showing the intensity discussed below, Plaintiff has shown that the proposed action is significant and requires the preparation of an EIS. Again, a determination that

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SIMPLOT'S MOTION FOR SUMMARY JUDGMENT - 8

significant effects on the human environment will in fact occur is not essential. *Sierra Club*, 843 F.2d at 1193. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared. *Id.*

### 1. Highly Controversial

Defendant also argues that the proposed land exchange is not "highly controversial." *Def.'s Memo, pg. 11.* As fully defined in *Blue Mountains*, "controversial" is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). Plaintiff has shown that there is a substantial dispute about the effect of the land exchange. Defendant also misstates the rule from *Reese*. The Court did not hold that there is no controversy "when there is no evidence that any agency has any objection to the exploratory project." *Def.'s Memo, pg. 11.* The Court in that case stated, "The lack of objection by other agencies is one factor that may be considered." *Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234, 1243 (D. Idaho 2005).

### 2. Cumulative Impacts

The Plaintiff's reliance on *Te-Moak Tribe* is correct. Defendants argue that *Te-Moak Tribe* supports their position. However, this would only be correct if the *Te-Moak Tribe* case only discussed uncertainty and the mitigation measures. It does not. The Ninth Circuit also considered the BLM's lack of consideration of the cumulative impacts of the proposed action. On considering the cumulative impacts, the Court found that the BLM had not met the requirement and was required to perform an EIS. *Te-Moak Tribe v. USDOI*, 608 F.3d 592 (9th Cir. 2010).

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SIMPLOT'S MOTION FOR
SUMMARY JUDGMENT - 9

A project's "cumulative impact," is: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR § 1508.7.

Defendant has expended significant effort in documenting the review of Gyp-Stack technology and effectiveness in evaluating the potential environmental impacts of the land exchange. This portion of their brief encompasses five pages. *Def.'s Memo, pgs. 5-9*. Defendant claims that the Tribes have cited no information to the contrary. *Def.'s Memo, pg. 7*. While the Defendant has stated numerous times that the BLM is not required to engineer a liner, they seem to demand that the Tribes demonstrate precise problems that could occur with the gyp-stack liner that might be installed on a new gyp-stack. *Id.* This is not required of Plaintiffs. The burden that is imposed on Plaintiff is not an onerous one. *Te-Moak Tribes*, 608 F.3d at 605. The Court has declined to impose a greater burden, noting that "the [Defendants] failed first; they did not properly describe other area projects or detail the cumulative impacts of these projects." *Id.* The Court continued:

> We conclude that in order for Plaintiffs to demonstrate that the BLM failed to conduct a sufficient cumulative impact analysis, they need not show what cumulative impacts would occur. To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action. *See id.* Such a requirement would thwart one of the "twin aims" of NEPA-to "ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decisionmaking process." *Id.*

The Plaintiff must only show the potential for cumulative impacts. *Id.*

The Defendant also cites to the review performed in concluding that a "new gyp stack" that incorporates "a liner, internal drainage, and proper water management would have ***little or no seepage or transport of contaminants*** from phosphogypsum waste ***into shallow ground water.*** " *Def's Memo at pg. 7* (emphasis added). The next line in that review discusses the possibility "that punctures or seam seepage could occur that would allow ***some impact to groundwater.***" BR 340. It is not just the review of mitigation measures that is required. The Defendants have not considered the cumulative impacts of the ***little or no seepage or transport of contaminants*** from phosphogypsum waste ***into shallow ground water.*** Defendants have taken considerable mitigation measures, but the impacts of any additional contamination from an expansion of the gypsum stack added to the current contamination caused by the current gypsum stack must be considered. This can be done by conducting an EIS.

Defendant has even submitted a Motion to Leave to Submit Supplemental Information on Remedial Considerations. Dkt. 46. Defendants claim that this shows that remedial measures have been taken, one of which is lining the existing gyp-stack. However, Defendants are not actually lining the existing gyp-stack. They are installing a synthetic liner on the receiving surface of the gypsum stack to reduce the infiltration of contaminated water through the stack into groundwater. Exhibit A to Dkt. 48, pg. 22. Even with this, the contamination from the existing gyp-stack will only reduce the phosphorous loading to the Portneuf River by 50% as of December 31, 2013 and 94% by 2021. Dkt. 48, pg. 4. This shows the potential for cumulative impacts. The existing gyp-stack will continue to release contaminants until 2021 in the best case scenario, and possibly longer. Even with the best practices required for the new gyp-stack, there is a demonstrated possibility of contamination through punctures or seam seepage.

Additionally, the remediation measures have not been done solely because Simplot has wanted to do them. The measures have been required as part of the Consent Decree and now the First Amendment to the Consent Decree following designation as a Superfund site. *Exhibit A – Declaration of Alan Prouty, pg. 7*. Part of the reasoning for the amendment to the Consent Decree was that the EPA determined that releases of greater significance than the EPA had recognized in the 1998 ROD are ongoing at the facility. *Exhibit A – Declaration of Alan Prouty, pg. 27*. This has been determined to be from the migration of process waters percolating through the gypsum stack and releases within the main plant area that have contributed to phosphorus loading to groundwater. *Id.* The amendment also does not address risks to human health and the environment due to contaminants of concern in other media such as soil and air. *Id.* at 28.

Finally, Defendant states that the Final EA concludes that the "exchange of lands would not impact water quality but activities allowed on them after the exchange could potentially improve or degrade the water quality." *Def's Memo, pg. 14*. The time to prepare an EIS is now, before the BLM loses any determination of what is done with the lands. The purpose of an EIS is to inform decisionmakers of the disruptive environmental effects that may flow from their decisions when they retain a maximum range of options. *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). NEPA is to help ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An EIS must be prepared before any irreversible and irretrievable commitment of resources. *Conner*, 848 F.2d at 1446. The Court in *Friends of Se.'s Future* added that an agency action constitutes an "irreversible and irretrievable commitment of resources" when the government no longer retains the "absolute right" to control

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SIMPLOT'S MOTION FOR
SUMMARY JUDGMENT - 12

the resources in question. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998). In this case, once the BLM transfers the land, the government will no longer retain the "absolute right" to control the land.

While the Defendant's have expended considerable time discussing mitigation measures, they have missed the reason why Plaintiff cited to the *Te-Moak Tribe* case. Defendants seem to be doing the same thing that the Defendant's in that case did. The facts show that the Defendant has taken mitigation measures. However, the BLM must also consider the cumulative impacts of the proposed land exchange. This can only be done by performing an EIS.

III. VIOLATION OF FLPMA

Because the BLM has not complied with the requirements of NEPA by taking a "hard look" and adequately considering foreseeable cumulative effects as discussed above, it cannot have acted in the public's interest in compliance with its duty to protect public lands and it therefore has violated the FLPMA. Defendant also states, "BLM policy encourages transferring liability and associated management concerns of contaminated lands to potentially responsible parties whenever possible." *Def.'s Memo, pg. 16.* While this may be BLM's policy, this transfer of land is of more land than what is already contaminated. The selected land in the transfer is 718.56 acres. BR 316. The selected land includes 140 acres of previously contaminated land. BR 322. That is 140 out of the 718.56 acres that will be transferred to Defendant.

Defendant argues that there is no evidence in the record to suggest that there is even a potential impact (that has not been analyzed and mitigated) from the lined gyp stack. *Def.'s Memo, pg. 15.* This is simply not true and not supported by the record. As discussed previously, there is the possibility of punctures or seam seepage that could impact the water quality. Additionally, the EA states that activities allowed after the exchange could potentially improve

or degrade the water quality. BR 332. As previously argued, there has been a violation of NEPA and therefore a violation of the FLPMA.

IV. BREACH OF TRUST RESPONSIBILITY

Similarly, where the BLM has failed to comply with and enforce federal environmental regulations, as previously discussed, which would directly and negatively impact the plaintiff Tribes, the Defendants have breached their trust responsibility toward the Tribes. Simplot's conclusion that the BLM's trust obligations were discharged by complying with the law is conclusory, and relies on a narrow reading of *Nance v. EPA* In forming this conclusion, Simplot cites to the language in *Nance* which states:

> In specifically finding that the redesignation would not, under the law as it stood at that time, have any effect on strip mining, the EPA adequately addressed the Crow's interest in this regard. Therefore, by seeking a regulation that would have no affect on the Crows ability to mine coal, the EPA complied with the law, thereby fulfilling its trust obligations to the tribe.

*Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981).

*Nance v. EPA* can be distinguished on the facts. *Nance* dealt with a regulation that would ultimately have no effect on the Crow Tribe. In determining the regulation would have no effect on the Tribe, the Court found that the EPA had met its duty of trust to the Crow tribe. The Court also had to consider the trust responsibility owed to the Northern Cheyenne Tribe. This case is different in that the proposed land exchange, and expansion of Simplot's gyp-stack site *will* have an effect on the Shoshone-Bannock Tribe, and there are no other tribal interests, or trust responsibility to consider except the trust responsibility owed to the Shoshone-Bannock Tribe. Finally, *Nance* can also be read to establish the trust responsibility as the Court cites to *Seminole*

when stating, "Two questions are presented by this set of facts. First, was the EPA required to proceed in a Trustee capacity vis a vis the Crow Tribe, and second, if it was so required, did it fulfill that obligation? It is fairly clear that *any* Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes. *Nance,* 645 F.2d at 711, citing *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942).

The next case Simplot cites is *Gros Ventre Tribe v. United States*. Simplot relies on that case to show that unless there is a specific duty placed on the government with respect to Indians, the responsibility is discharged by the agency's compliance with general regulations and statutes. The Court in *Gros Ventre* states that "without an unambiguous provision by Congress that clearly outlines a federal trust responsibility the courts must appreciate that whatever fiduciary obligation otherwise exists, is a limited one only." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir. 2006). In that case the Court recognized the existence of the trust responsibility, but limits it in a fiduciary sense.

In *Navajo Tribe of Indians v. United States*, the Court of Claims reiterated the importance of the trust responsibility to federal agencies.

> We have noted, with great frequency, that the federal government is the trustee of the Indian tribes' rights, including fishing rights. See, e.g., Joint Bd. of Control v. United States, 862 F.2d 195, 198 (9th Cir. 1988). This trust responsibility extends not just to the Interior Department, but attaches to the federal government as a whole. This does not mean, however, that all the rules governing the relationship between private fiduciaries and their beneficiaries and accountings between them necessarily apply in full vigor in an accounting claim by an Indian tribe against the United States . . . . In each situation the precise scope of the fiduciary

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SIMPLOT'S MOTION FOR
SUMMARY JUDGMENT - 15

obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the government and the particular tribe."

*Navajo Tribe of Indians v. United States*, 624 F.2d 981, 988 (Ct. Cl. 1980). The tribal trust doctrine was established by Justice Marshall in *Cherokee Nation v. Georgia*. In that case the Supreme Court classified tribes as Domestic Dependent Nations, and analogized the relationship of the Tribes the U.S. as that of a ward to a guardian. The Marshall Court provided the original language that led to the Tribal Trust Doctrine by stating:

> It may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can with strict accuracy be denominated foreign nations. They may more correctly perhaps be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases-meanwhile they are in a state of pupilage. Their relations to the United States resemble that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father.

*Cherokee Nation v. Georgia* 30 U.S. 1, 15 (1831). The ward guardian terminology coined by the Marshall Court provided the basis for the development of the tribal trust doctrine. Since, Congress has placed a fiduciary-like trust responsibility on the government in its dealings with Native Americans. In *Seminole*, the Supreme Court defined this trust responsibility by holding, "The federal government has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealing with the

Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1941).

Even a limited fiduciary duty, as set forth in *Gros Ventre*, still requires the BLM to recognize its trust responsibility to the Shoshone-Bannock Tribes. Violation of NEPA and the allowance of further contamination to their aboriginal lands, where treaty rights still exist, does not fulfill the trust responsibility.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion for Summary Judgment.

DATED this 29th day of October, 2010.

/s/ Matt S. Echo Hawk
Matt Echo Hawk
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2010, I caused to be served a true and correct copy of the foregoing by the method indicated below, and addressed to the following:

| | | |
|---|---|---|
| Secretary Kenneth Salazar<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br>Telephone: (202) 208-7351<br>Facsimile: (202) 208-5584 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |
| Director Bob Abbey<br>Bureau of Land Management<br>1849 C Street NW, Rm. 5665<br>Washington DC 20240<br>Telephone: (202) 208-3801<br>Facsimile: (202) 208-5242 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |
| United States Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530-0001 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |
| Thomas E. Moss, United States Attorney<br>Attention: Civil Process Clerk<br>800 Park Blvd., Suite 600<br>Boise, Idaho 83712<br>Telephone: (208) 334-1211<br>Facsimile: (208) 334-9375 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SIMPLOT'S MOTION FOR SUMMARY JUDGMENT - 18

| | | |
|---|---|---|
| Albert P. Barker<br>Paul Arrington<br>Barker Rosholt & Simpson LLP<br>1010 W. Jefferson, Ste. 102<br>P.O. Box 2139<br>Boise, Idaho 83701-2139<br>Telephone: (208) 336-0700<br>Facsimile: (208) 344-6034 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |
| Terry T. Uhling<br>Sheila G. Bush<br>J.R. Simplot Company<br>999 Main Street, 13th Floor<br>P.O. Box 27<br>Boise, Idaho 83707-0027<br>Telephone: (208) 389-7317<br>Facsimile: (208) 389-7464 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |
| David H. Maguire<br>MAGUIRE & PENROD<br>1414 e. Center – P.O. Box 4758<br>Pocatello, Idaho 83205-4758<br>Telephone: (208) 232-5167<br>Facsimile: (208) 232-5181 | ☐<br>☐<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Telecopy (Fax)<br>ECF Notice |

/s/ Matt S. Echo Hawk
for ECHOHAWK LAW OFFICES

H:\WDOX\CLIENTS\0001\0359\00036606.DOC