Albert P. Barker, ISB #2867
Paul L. Arrington, ISB #7198
**BARKER ROSHOLT & SIMPSON LLP**
1010 W. Jefferson, Suite 102
P.O. Box 2139
Boise, Idaho 83701-2139
Telephone: (208) 336-0700
Facsimile: (208) 344-6034
E-mail: apb@idahowaters.com
        pla@idahowaters.com

Terry T. Uhling, ISB #2581
Sheila G. Bush, IBS #3248
**J.R. SIMPLOT COMPANY**
999 Main Street, 13th Floor
P. O. Box 27
Boise, ID  83707-0027
Telephone: (208) 389-7317
Facsimile: (208) 389-7464
E-mail:tuhling@simplot.com
        sheila.bush@simplot.com

*Attorneys for Intervenor, J.R. Simplot Company*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>Defendants.<br><br>And<br><br>J.R. SIMPLOT COMPANY<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 4:10-CV-00004<br><br>**J.R. SIMPLOT COMPANY'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

I.       INTRODUCTION ..................................................................................................... 1

II.      THE STANDARD OF REVIEW OF A DECISION TO PREPARE AN EA
         IS ARBITRARY AND CAPRICIOUS/CLEAR ERROR OF JUDGMENT ........................... 2

III.     THE BLM'S TECHNICAL DECISIONS ARE ENTITLED TO DEFERENCE ................... 3

IV.      THERE IS NO SCIENTIFIC EVIDENCE THAT LINED GYP STACKS
         INVOLVE SUBSTANTIAL QUESTIONS OF ENVIRONMENTAL IMPACTS ................ 4

         1.     An EIS Is Not Automatically Required when a Proposed Action is Near a
                Superfund Site.............................................................................................. 6

         2.     A Review of the "Intensity" Factors Supports the BLM's Decision. .............. 7

V.       THE BLM CAREFULLY CONSIDERED THE CUMULATIVE IMPACTS OF THE
         LAND EXCHANGE ................................................................................................. 7

VI.      THERE IS CONSIDERABLE OVERSIGHT IN PLACE TO ENSURE THAT THE
         MITIGATION MEASURES WILL BE INCORPORATED IF THE GYP STACK IS
         EXPANDED ............................................................................................................ 8

VII.     THERE IS NO FLPMA VIOLATION ...................................................................... 9

VIII.    THERE IS NO TRUST VIOLATION ...................................................................... 10

IX.      CONCLUSION ...................................................................................................... 10

## TABLE OF AUTHORITIES

## CASE LAW

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ................ 7

*Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009) .................................. 2

*Cranston v. Clark*, 767 F.2d 1319, 1322 (9th Cir. 1985)..................................................................... 3

*Dept. of Transp. v. Public Citizens*, 541 U.S. 752, 763 (2004) ........................................................ 2

*Earth Island Inst. v. Carlton*, ___ F.3d ___, 2010 WL 4399138 (9th Cir. 2010)....................... 2, 3, 4

*Ecology Center v. Castenada*, 562 F.3d 986, 992 (9th Cir. 2009)..................................................... 3

*Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234 (D. Idaho 2005) ............................... 7

*Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010) ............................................................................ 5

*Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008)...................................................... 3, 4

*Marsh v. Oregon National Resources Council*, 490 US 360, 378 (1989) ......................................... 3

*Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1240 (9th Cir. 2005) .................. 5

*Northwest Env. Adv. v. Nat. Marine Fisheries Serv.*, 460 F.3d 1125, 1135 (9th Cir. 2006) ............... 3

*Te Moak Tribe v. Department of Interior*, 608 F.3d 592 (9th Cir. 2010) ......................................... 7,8

*Tillamook Cty. v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143 (9th Cir. 2002) .................... 8

## RULES & REGULATIONS

40 C.F.R. § 1501.4(b) ........................................................................................................ 7

40 C.F.R. § 1508.27(a)....................................................................................................... 6

40 C.F.R. § 1508.27(b) ...................................................................................................... 7

# I.    INTRODUCTION

The Tribes' legal arguments can be boiled down to four assertions, each demonstrably false.[1]  Two relate to the standard of review, one to their burden of coming forward with information and the fourth is a claim that the agency did not consider a key fact.  First, they assert that the decision to prepare an EA and FONSI is entitled to no deference.  Next, they argue that the BLM has no expertise and therefore is entitled to no deference.  Then they argue that they can create "substantial questions" about potential impacts without any factual or scientific evidence.  Finally, they wrongly assert that the BLM did not consider the impacts of placing a gyp stack on the property.

Because the Tribes misapprehend the legal standards, have failed to offer a shred of evidence that there are "substantial questions" about any environmental impacts from a lined gyp stack, and are wrong to say that the BLM did not consider the impacts of using the property for a gyp stack, judgment should be entered for Defendants.

The EA, FONSI, and Administrative Record demonstrate that the BLM took the possibility of placing a gyp stack very seriously, provided the necessary "hard look" required under NEPA and complied with the Federal Land Management Policy Act ("FLPMA") and the BLM's trust obligations to the Tribes.  The IBLA carefully and independently reviewed this decision.  The exchange provides substantial, undisputed wildlife benefits.  The BLM's actions were not arbitrary and capricious, and this Court should affirm the BLM's and IBLA's decisions.

---

[1] The Tribes filed two opposition briefs – one to Simplot's motion (Docket No. 54) and one to the BLM's motion for summary judgment (Docket No. 55).  All references to "*Tribes JRS Opp.*" reference the opposition to Simplot's motion (Docket No. 54), while citations to "*Tribes BLM Opp.*" reference the opposition to BLM's motion (Docket No. 55).

## II.    THE STANDARD OF REVIEW OF A DECISION TO PREPARE AN EA IS ARBITRARY AND CAPRICIOUS/CLEAR ERROR OF JUDGMENT

This case is reviewed under the APA's arbitrary and capricious standard.  In *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009), the Court upheld an agency's decision to prepare an EA rather than an EIS, stating:

> Review under the APA's "arbitrary and capricious" standard is "searching and careful" but "narrow" – the Court does not substitute its judgment for that of the agency. Rather, ***the Court is "highly deferential [to the agency and] presumes the agency action to be valid***."

*Id*. at 707 (citation omitted) (emphasis added); *Dept. of Transp. v. Public Citizens*, 541 U.S. 752, 763 (2004) (decision not to prepare an EIS "can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law'")**.**

The Tribes assert that the court's standard of review for an EA is different than for an EIS.  *Tribes' BLM Opp*. at 5 (deference "is simply not applicable to the present case, where Plaintiffs are challenging the agency decision at a much earlier step in the NEPA process").  This is not a correct statement of the law.  The Court is "highly deferential" of the decision to prepare an EA and "presumes the agency action to be valid."  *Center for Biological Diversity, supra*.  A court can "reject an agency's decision '***only*** if the [agency] committed ***a clear error of judgment***.'"  *Tillamook Cty. v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143 (9th Cir. 2002) (emphasis added).  Accord *Earth Island Inst. v. Carlton*, ___ F.3d ___,  2010 WL 4399138 (9th Cir. 2010) (court's role to ensure no clear error of judgment by agency).

As the Ninth Circuit has explained in the context of an EA:

> The NEPA is a procedural statute intended to ensure environmentally informed decision-making by federal agencies. … When an agency makes a decision subject to the NEPA's procedural requirements, ***"the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive***."

*Tillamook* at 1143-44 (internal citations omitted) (emphasis added).

Absent a clear error of law, the Court cannot overturn the agency's decision, "even if, as an original matter, a court might find contrary views more persuasive." *Lands Council v. McNair,* 537 F.3d 981, 1000 (9th Cir. 2008) (*en banc*).  The agency has "broad discretion in choosing how to respond to opposing scientific evidence." *Earth Island Institute v. Carlton*, -- F.3d --, 2010 WL 4399138 (9th Cir. 2010); *Northwest Env. Adv. v. Nat. Marine Fisheries Serv.*, 460 F.3d 1125, 1135 (9th Cir. 2006) (the court "is not to substitute [its] 'judgment for that of the agency concerning the wisdom or prudence of a proposed action'").  Clearly the arbitrary and capricious standard is the standard of review.

The Tribes do not even address the deference owed to IBLA decisions.  The IBLA carefully reviewed the BLM's decision and each of the Tribes' arguments and concluded that the BLM did not violate NEPA. BR 1.  This decision is accorded a "high level of deference." *Cranston v. Clark*, 767 F.2d 1319, 1322 (9th Cir. 1985).

### III.   THE BLM'S TECHNICAL DECISIONS ARE ENTITLED TO DEFERENCE

The Tribes next argue that the BLM's technical decision concerning the impacts of lined gyp stacks is entitled to no deference.  This is exactly backwards.  An agency's technical decisions are owed great deference. *Marsh v. Oregon National Resources Council*, 490 US 360, 378 (1989); *Ecology Center v. Castenada*, 562 F.3d 986, 992 (9th Cir. 2009).  It is "not a proper role for" the court to "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses… chooses among scientific studies… and orders the agency to explain every possible scientific uncertainty." *McNair*, 537 F.3d at 988.

The record in this case evidences a significant effort by the BLM to consider and Simplot to address the potential impacts of the land exchange.  Early drafts of the EA did not include any required liners or other mitigation for the potential gyp-stack expansion, *see* BR 380 & 408, and the Tribes called for a liner, BR 2329; 2362; 2380 & 2383.  Simplot then committed to

incorporate such a liner if the gyp stack is expanded.  BR 458-59.  The BLM technical staff

thoroughly evaluated the regulatory and technical standards for placement of gyp stacks.  BR

337-41; *see also, e.g.*, BR 536; 538; 539; 549; 599; 1791 & 2016.  BLM's Senior Mining

Engineer, Jeff Cundick, conducted this investigation.  BR 536.  The BLM concluded that liners

represented a "fairly mature" technology that "has proven to work well," BR 339, and thus

"impacts from a new gyp-stack are not expected to be significant," BR 340. Florida regulators, in

a much wetter climate, report that lined gyp stacks "do not have any ground water issues."  BR

536.

The agency's technical expertise was exercised by consulting with regulatory agencies

nationwide.  The BLM concluded that the regulatory environment and technical merits of liners

provided adequate assurance that there would be no significant impacts.[2]  The Tribes cite no

contrary scientific evidence.  This is exactly the type of technical decision making that is

afforded deference by the courts.  *McNair, supra*.  In *Earth Island Institute v. Carlton, supra*, the

Court instructed that "we give great deference to agencies when faced with this type of scientific

evidence."  2010 WL 4399138 at * 5**.**

## IV.     THERE IS NO SCIENTIFIC EVIDENCE THAT LINED GYP STACKS INVOLVE SUBSTANTIAL QUESTIONS OF ENVIRONMENTAL IMPACTS

The Tribes argue that they need only assert that there are "substantial questions" about

the impact of the land exchange and that bare assertion triggers a requirement for an EIS.  The

only "substantial question" the Tribes allege is impacts from placing a gyp stack with a liner in

the property.  Yet, they point to no scientific evidence to support this claim.

---

[2] The BLM also extensively reviewed the cleanup efforts at the EMF Superfund Site.  BR 1201 (Ecological Risk Assessment); 1222 (Record of Decision); 1235 (Preliminary Site Characterization Summary of the Remedial Investigation and Feasibly Study); 1240 (Off-Site Surficial Soil Contaminant Plots); 1390 (EMF Contamination Site Descriptions); 1506 (Public Health Assessment – EMF Contamination prepared by the Idaho Department of Environmental Quality) & 1659 (CERCLA Consent Decree).

In *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010), the Court explained that EAs have been held insufficient where the EAs failed to respond to specific scientific studies showing a risk that the action would cause a significant impact.  In *Hapner*, the Court upheld the EA because it did not ignore contrary scientific evidence.  Here there is no scientific controversy or debate.  Liners work and regulators require them.  BR 536, 548.

For the first time on appeal, the Tribes' assert that the risk of leakage of the liners was acknowledged, and that risk therefore demands an EIS.  *Tribes' JRS Opp*. at 11.[3]  However, the BLM did evaluate that risk and concluded it was not substantial.

The EA provides:

> A new gyp-stack containing a liner, internal drainage, and proper water management <u>would have little or no seepage or transport of contaminants from phosphogypsum waste into shallow ground water</u>.  There is a possibility that some punctures or seam seepage could occur that would allow some impact to groundwater.  This impact is anticipated to be very small, however, if construction and operation of the stack utilizes property engineering, surface preparation, construction quality assurance/quality control, and maintenance/operation practices.

BR 340 (underline added).  While claiming this statement raises a "substantial question," the Tribes fail to provide any scientific evidence casting doubt about the agency's conclusions that the possibility of a tear is slight, impacts small and remediation is effective.  BR 536, 548.

In *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1240 (9th Cir. 2005), the plaintiffs asserted that an EIS must be prepared because an EA approving a forest vegetation project admitted that the project "may impact individual goshawks and their habitat."  *Id*.  The Court rejected the argument:

---

[3] The allegation that the BLM should consider the impacts of "little or no seepage" and possible punctures was never asserted during the administrative proceedings.  *See* BR 2324; 2362 & 2379.  The Tribes did not make these allegations before the IBLA, BR 94 & 109, or in their *Complaint*.  As a matter of law, the Tribes cannot assert this issue in this lawsuit.  *Dept. of Transp.*, 541 U.S. at 764 ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it … alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration") (citations omitted).

Under Native Ecosystems' theory, any information included in an EA and its supporting NEPA documents that admit impacts on wildlife species and their habitat would trigger the preparation of an EIS. ***Not only would such a standard deter candid disclosure of negative information, it does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment***. We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome. ***NEPA permits a federal agency to disclose such impacts without automatically triggering the "substantial questions" threshold***. In short, NEPA requires us to determine whether the Forest Service took a "hard look" at the environmental consequences of a proposed action.

A "hard look" should, of course, involve the discussion of adverse impacts. A "hard look" does not dictate a soft touch or brush-off of negative effects. But such information does not automatically make the project "highly controversial" or "highly uncertain" for the purposes of determining whether substantial questions exist as to the significance of the effect.

*Id*. at 1240-41 (emphasis added).

### 1. An EIS Is Not Automatically Required when a Proposed Action is Near a Superfund Site.

The Tribes then claim that, since "the context in this case is that the current site is a Superfund site and on the National Priority List," an EIS is required. *Tribes' JRS Opp*. at 8. There is no such rule. *See* 40 C.F.R. § 1508.27(a). The Tribes' argument is supported by no authority. The proximity of a Superfund Site does not mandate an EIS. There are only seven circumstances where an EIS is "normally" required. BLM's NEPA Handbook at 70.[4] For all

---

[4] (1) Approval of Resource Management Plans.
  (2) Proposals for Wild and Scenic Rivers and National Historic Scenic Trails.
  (3) Approval of regional coal lease sales in a coal production region.
  (4) Decision to issue a coal preference right lease.
  (5) Approval of applications to the BLM for major actions in the following categories:
      (a) Sites for steam-electric power plants, petroleum refineries, synfuel plants, and industrial structures
      (b) Rights-of-way for major reservoirs, canals, pipelines, transmission lines, highways and railroads
  (6) Approval of operations that would result in liberation of radioactive tracer materials or nuclear stimulation
  (7) Approval of any mining operation where the area to be mined, including any area of disturbance, over the life the mining plan is 640 acres or larger in size.
The BLM Handbook can be viewed at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf (last viewed on Nov. 11, 2010).

other activities, the NEPA regulations provide that the BLM may prepare an EA to determine if the proposed action would significantly impact the environment.  40 C.F.R. § 1501.4(b).  Here there is no evidence of a significant impact.

>    2.    A Review of the "Intensity" Factors Supports the BLM's Decision.

The Tribes then fail to show that the proposed action is "highly controversial."  40 C.F.R. § 1508.27(b).  They fail to point to any scientific controversy in the record to contradict the BLM's findings.  Their objection is nothing more than an "opposition to a use," *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998), which is not "highly controversial."  *Greater Yellowstone Coalition v. Reese*, 392 F.Supp.2d 1234 (D. Idaho 2005).  There is nothing in the record to dispute the BLM's conclusions about size, nature or effects of the project, so it is not "highly controversial."  *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

>    V.    THE BLM CAREFULLY CONSIDERED THE CUMULATIVE
>           IMPACTS OF THE LAND EXCHANGE

The Tribes interpret *Te Moak Tribe v. Department of Interior*, 608 F.3d 592 (9th Cir. 2010), as requiring an EIS whenever the Tribes claim that cumulative impacts were not considered.  *Tribes' JRS Opp*. at 9-14.  *Te Moak* cannot be stretched that far.  *Te Moak* addresses two distinct questions regarding cumulative impacts: (1) uncertain impacts (i.e. from drill sites and access roads with unknown locations), 608 F.3d 599-601, and (2) impacts from two additional known and approved projects in the cumulative effects area, *id*. at 602-07.  The Tribes confuse these separate holdings.

As to uncertain impacts, the Court held that the BLM may approve a project whose details are uncertain, if the agency imposes effective mitigation measures.  *Id*. at 600.  Since "the BLM imposed effective avoidance and mitigation measures to protect Western Shoshone cultural

resources from impacts," *id*. at 600-01, "the BLM did not violate NEPA," *id*. at 601.  Thus, the Te Moak Tribes' cumulative impact argument failed when the agency relied upon mitigation to avoid cumulative impacts.  Here, the Tribes admit that Defendants have undertaken "considerable mitigation measures."  Tribes JRS Opp. p. 11.  *See also* Prouty Declaration.

In a separate section of its opinion, the Court held that the BLM failed to adequately address the cumulative impacts of two other <u>known</u> <u>and</u> <u>approved</u> projects.  *Id*. at 602-03.  Here, the Tribes have identified no other projects which the BLM failed to consider.  In fact, impacts from the only known projects, the EMF site and the land exchange, were both extensively considered.  *See* BR 317-18, 319, 321-34, 335-36.

The BLM thoroughly consider the possibility that the gyp stack might be expanded.  It responded by addressing mitigation measures, including a liner.  An agency is "***not required to develop a complete mitigation plan*** detailing the 'precise nature … of the mitigation measures' ***nor were the measures required to 'completely compensate for adverse environmental impacts*.***'"  *Tillamook*, *supra* at 1144 (citation omitted) (emphasis added).  The Tribes admit that Simplot's mitigation efforts are "considerable."  The BLM's decision to prepare an EA and FONSI is not arbitrary and capricious and should be affirmed.

## VI. THERE IS CONSIDERABLE OVERSIGHT IN PLACE TO ENSURE THAT THE MITIGATION MEASURES WILL BE INCORPORATED IF THE GYP STACK IS EXPANDED

The Tribes conclude their NEPA arguments with a plea to the Court to remand this matter because "the time to prepare and EIS is now, before the BLM loses any determination of what is done with the lands."  *Tribes' JRS Opp*. at 12-13.  The Tribes' argument, while not a proper NEPA argument, overlooks the record which demonstrated extensive regulatory oversight should the gyp stack be expanded.

BLM determined that Simplot will be required to comply with Air Pollution Control regulations, IDAPA 58.01.01, *et seq.*, the Ground Water Quality Rules, IDAPA 58.01.11, *et seq.*, the Safety of Dams Rules, IDAPA 37.03.06, *et seq.*, and IDEQ's requirements for non-municipal wastewater disposal facilities, IDAPA 58.01.16.401.01.  *See also* BR 337-41 (discussing regulatory requirements applied for Agrium gyp stack in Idaho).  Power County may require a Special Use Permit.  BR 537.

Simplot committed to BLM to install a liner and then entered into a Voluntary Consent Order/Compliance Agreement ("VCO") with IDEQ that requires "any new gypsum storage/stack built at the Don Plant … ***shall include a liner in its design***."  BR 458-59 (emphasis added). IDEQ confirmed that "Any new gyp stack construction, however, would be subject to the Ground Water Quality Rules" and that IDEQ "intends to implement" the ground water quality rule for any expansion.  BR 528-29.

The recently approved CERCLA *Consent Decree Amendment* further obligates Simplot to "notify EPA at least 180 days prior to beginning such construction" of any new gyp stack and must provide to EPA a number of documents, including the new gypsum stack design, ***including liner design***.  *Prouty Dec.,* Ex. A (SOW at 7).

In short, the evidence demonstrates that the relevant regulatory agencies will have a major role in oversight of any potential gyp-stack expansion.

## VII.   THERE IS NO FLPMA VIOLATION

The Tribes' entire FLPMA argument depends solely on the NEPA argument, but the BLM did not violate NEPA, so there is no FLPMA violation. Furthermore, the Tribes do not dispute the substantial public benefit from the land exchange.  Support for the acquisition of the offered lands is unanimous, BR 606; 618; 629 – even the Tribes concur, BR 2328.  EPA supports acquisition of the selected lands, BR 316 & 619.  BLM policy encourages the transfer of

"liability and associated management concerns of contaminated lands to potentially responsible parties (PRP)", such as Simplot in this case, "whenever possible."  BR. 331.  This land exchange clearly is in the public interest and should be affirmed.

## VIII.   THERE IS NO TRUST VIOLATION

The Tribes' trust argument ultimately recognizes that BLM's activities off reservation raises only a "limited fiduciary duty."  *Id*. at 17.  They do not dispute that the Ninth Circuit holds that where there is no other violation of federal law there is no breach of trust.  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir. 2006) ("[U]nless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes").  By complying with NEPA, the BLM has fulfilled its duty.

## IX.   CONCLUSION

The BLM thoroughly analyzed the cumulative impacts of the land exchange.  This included the possible impacts of a possible expansion of the gyp stack – even though the expansion may never happen.  This exchange is clearly in the public interest.  The BLM's decision is not arbitrary or capricious and should be upheld.

DATED this 19th day of November, 2010.


By:     _____/S/_____
                Albert P. Barker
                Paul L. Arrington

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 19th day of November, 2010, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Ayako Sato (ayako.sato@usdoj.gov)
David H. Maguire (Maguire@maguire-kress.com)
Katherine G. Strong (kgstrong@gmail.com)
Matthew S. Echo Hawk (matt@echohawk.com)
Paul C. Echo Hawk (paul@echohawk.com)


/S/
Albert P. Barker