IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES of the FORT HALL RESERVATION,<br><br>           Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>           Defendants.<br>And<br><br>J.R. SIMPLOT COMPANY<br><br>         Defendant-Intervenors. | Case No. 4:10-CV-004-BLW<br><br>**MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The Court heard

oral argument on April 25, 2011, and took the motions under advisement. For the reasons

expressed below, the Court will grant the motion filed by the plaintiff Shoshone-Bannock

Tribes and deny the motions filed by the BLM and Simplot.

## FACTUAL BACKGROUND

In the 1940s, Simplot and FMC corporation built phosphate processing facilities

about two miles northwest of the City of Pocatello. The Simplot plant is known as the Don plant. Both plants produced phosphogypsum, a solid waste by-product of the manufacturing process. The phosphogypsum is primarily gypsum and phosphorus, and includes contaminates such as arsenic, low-level radionuclides, selenium, zinc, cadmium, vanadium, fluoride, sodium, potassium, chloride, nitrates, ammonia, and sulfate. *AR* 335-36.

This phosphogypsum waste from the Simplot plant is pumped as a slurry into a "gyp-stack," a storage facility 240 feet tall that spreads out over 400 acres. *Id*. 336. By 2007, it contained 66 million tons of phosphogypsum waste. *Id*.

The Simplot gyp-stack is not lined, and the slurry of phosphogypsum has leached over the years into the groundwater. *AR* 1391. The groundwater moves generally north-northeast under the gyp-stack, and discharges to springs and to the Portneuf River. *Id*. The Portneuf River flows past the Simplot plant and onto the Fort Hall Indian Reservation through an area known as "the Bottoms" where a majority of Shoshone-Bannock traditional and ceremonial activities occur, including fishing and gathering of native plants. *See Exhibit A, Declaration of Prouty* at p. 9.

In 1976, the Idaho Department of Health and Welfare found elevated levels of arsenic, lead, and cadmium in monitoring wells down-gradient from the two plants. *AR* 1390. In the summer of 1987, the EPA detected arsenic, cadmium, and selenium in monitoring wells in the deep confined aquifer that runs under the area. *AR* 321. The EPA also discovered heavy metals in the sediments of the gyp-stack. *Id*. In addition, elevated

contaminate levels were found in soils both on-site and off-site. *AR* 1391. In all, 2,530 acres of land surrounding the plants were found to have "contamination levels of concern." *Id.*

The culmination of all these studies came in 1990 when the area of the two plants was declared a Superfund Cleanup Site under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). *AR* 321. It is referred to as the Eastern Michaud Flat Superfund Site (EMF Site). *Id.*

The dilemma for Simplot – then and now – is that the Don plant continues to generate waste that needs to be stored somewhere. In 1996, Simplot was projecting that its existing gyp-stack had a life expectancy of only another 8 to 10 years. *AR* 2521. A new gyp-stack, to be economical, would have to be built close to the plant. *AR* 413. But that meant building a new waste storage facility on or close by a Superfund Site that was created by the storage of that very same waste.

In its search for a new gyp-stack location, Simplot focused on a parcel of canyon land owned by the BLM just south of the plant. On April 29, 1994, Simplot submitted a letter to the BLM proposing a land exchange to acquire that BLM canyon land in exchange for land owned by Simplot in the Blackrock and Caddy Canyon areas approximately nine (9) miles southeast of Pocatello. *AR* 2417.

The land that Simplot sought to obtain from the BLM – referred to as the "selected land" – had a steep and mountainous terrain, and wrapped around the east and south sides of Simplot's existing property. *AR* 319. About 140 acres of the selected land lies within

the boundaries of the EMF Site, and the remainder adjoins it. *AR* 322. All of the selected land lies within the Fort Hall Reservation "ceded area." *AR* 324. The Tribes retain all rights on those ceded lands remaining in public ownership for wood gathering, livestock grazing, hunting, and harvesting. *AR* 2521. These rights, along with the duties imposed by the Pocatello Resource Management Plan and the trust obligation the Government owes to the Tribes, obligate the BLM to ensure that any land exchange is "closely coordinated with the Tribes." *AR* 317.

To obtain this BLM land, Simplot offered land it purchased specifically for the exchange, land that is important mule deer winter range. This land – referred to as the Blackrock property – "supports considerably more deer in the winter than the [selected land]." *AR* 325. The BLM considers the Blackrock land to have "superior resources" for both wildlife and recreation, and it contains prehistoric sites and artifacts. *AR* 321. If the land exchange was completed, the BLM would manage the Blackrock land, holding it in trust for the Tribes. *AR* 332. The Tribes would have rights for wood gathering, livestock grazing, hunting, and harvesting on those lands. *Id*.

Simplot stated its intention to use the BLM land to expand the gyp-stack. In a letter to the BLM, under a paragraph labeled "Intended Use," Simplot wrote:

> Simplot seeks to acquire this BLM land as a permanent storage area for the gypsum produced as a by-product in its phosphate fertilizer manufacturing process. Simplot utilizes the land it owns immediately adjacent to the north boundary of this BLM land for gypsum storage.

*AR* 2418.

On January 3, 1995, Simplot amended this proposal to ask for additional public lands held by the BLM in exchange for additional private lands held by Simplot. Simplot's "Intended Use" was the following:

> The parcel included in this amendment would be considered supplemental and would be used for the same purposes as those lands described in the original land exchange proposal.

*AR* 2411.

In July of 1995, the EPA prepared an Ecological Risk Assessment for the EMF Site. *AR* 322. It found that contaminates were being released from the EMF Site through the air, groundwater, and wastewater. *Id.* The Assessment found elevated levels of metals, radionuclides, fluoride and phosphorous in the soils and vegetation both within and outside the EMF boundaries. *Id.* The EPA concluded that the levels of contamination did not warrant a soil cleanup but did call for "institutional controls;" and that for the off-site areas, any risk to human health could be minimized by preventing residential development. *Id.*

In August of 1996, the land exchange process moved forward and a draft EA and FONSI was prepared by the BLM. *AR* 316, 408. In the draft FONSI, the BLM proposed going forward with the land exchange. The draft of the EA accompanying the FONSI stated that Simplot was proposing this land exchange "to obtain land suitable for gypsum waste disposal" because the company was concerned that its existing gyp-stack might be shut down by the EPA. *AR* 413. Simplot feared that failing to find a new site "could possibly mean the demise of Simplot's Don plant, increased operation and production

costs, and loss of jobs." *Id.* According to Simplot's studies, the site "should be located as close as possible to their existing fertilizer processing plant" in order to be "economically feasible." *Id.*

The draft EA went on to discuss the possible location and layout of the new gyp-stack in broad terms as no final plans had been developed:

> Simplot's primary interest is the large canyon within Section 19 [due south of Simplot's existing property line] of the selected land. The canyon area would be developed for the disposal and storage of gypsum waste following applicable state and federal regulations. Specific information about how the gypsum would be stored in the canyon is not available. Design plans and best engineering practices would be developed by Simplot prior to initiating a new stack within the canyon. These plans and engineering practices would be reviewed and approved by state and federal agencies having jurisdiction and authority. In general an access road would be built into the canyon along with a slurry line. The slurry line would transport gypsum waste from the Don plant to the stack within the canyon. The stack would start at the mouth of the canyon's north end and progress up the canyon (moving in a southerly direction) over its years of operation. The parcel of selected land within Section 17 [due east of Simplot's existing property line] would provide a buffer to the canyon within Section 19 and the Don plant.

*AR* 419.

The EPA reviewed these draft documents, and responded in a letter dated September 10, 1996, that it "is in support of the proposed land exchange." *AR* 619. The EPA explained that "Simplot's ownership and control of these properties will facilitate the implementation of any institutional controls identified in the EPA [ROD]. Furthermore, we encourage any expansion of the proposal to include additional areas adjacent to the current Simplot property boundary." *Id.*

About a month after this draft EA was prepared, the land exchange was put on

hold, awaiting a pending EPA Record of Decision (ROD) concerning the EIS evaluating

the EMF Site. *AR* 316, 2401, 2409. The EPA issued the ROD in 1998. To protect

groundwater, the EPA, in the ROD, selected a remedy that was designed primarily to

capture arsenic that was leaching from the EMF Site. *See Exhibit A to Prouty*

*Declaration* at p. 13. Groundwater monitoring revealed arsenic levels in the groundwater

exceeding safe levels set by the Safe Drinking Water Act. *Id.* at p. 10. Arsenic

accumulates in the body, typically through drinking water, and increases the risk for

various types of cancers and other health problems.

All parties believed that by capturing arsenic, the ROD remedy would also capture

phosphorus, another contaminate leaching from the EMF Site. *Id.* at p. 11. Phosphorus

has a "detrimental effect on water quality" and "on fish and other aquatic life." *Id.* at p.

15.

In the years following 1998, however, phosphorus was found in the Portneuf River

"to a degree that the EPA had not appreciated when it issued the ROD." *Id.* at p. 12.

Phosphorus concentrations in the Portneuf River, downstream from where the

groundwater passing under the EMF Site enters the River, were over ten times higher

than the Idaho Total Maximum Daily Load (TMDL) target level for the River. *Id.* at p.

15. A report issued in 2004 by the Idaho Department of Environmental Quality (IDEQ)

determined it was possible that up to 80% of the phosphorus in the Portneuf River was

coming from the EMF Site. *AR 336.* It became clear that the ROD remedy was not

working to keep phosphorus from entering the Portneuf River, prompting the EPA and

Simplot to engage in a series of talks to amend the ROD.  *Id.*

In 2002, Simplot renewed land exchange talks with the BLM, and amended their offer to include an additional 90 acres of private land for total of 666.92 acres.  *AR* 316. Simplot also identified additional public lands they were interested in acquiring, bringing the total public land acres to approximately 718.56 acres.  *Id.*

On February 23, 2004, Simplot submitted a second amendment to the land exchange that for the first time proposed that the "intended use" of the parcel of BLM directly south of the Simplot property would be used as an "additional buffer zone" rather than as a gyp-stack location:

> The parcel included in this amendment would be considered supplemental and would be used for an additional buffer zone as described in the original land exchange proposal.

*AR* 2402.

In October of 2006, the BLM prepared a draft EA evaluating the land exchange and submitted it for comment.  The Tribe, which had been in numerous negotiations with the BLM over this issue, objected to the EA, arguing that an EIS should be prepared, and that further mitigation measures must be required.  *AR* 2324-29.

The EPA also commented on the draft EA in a letter to the BLM dated February 12, 2007.  *AR* 604.  Noting the current contamination of the area's groundwater and the Portneuf River, the EPA expressed concern over "the potential significant cumulative impacts that could result from an additional gypsum stack (gyp-stack) added to the existing contamination from the current gyp-stack in the project area."  *Id*.  The EPA

suggested that the patent transferring title of the BLM lands to Simplot contain a

requirement that the

> EPA will review and approve the liner design and monitoring plan proposed by Simplot when available once it is developed because of EPA's expertise in the design and engineering for environmentally protective waste management systems and to ensure that the design and siting criteria are met.

*Id.*

To further review the EPA's concerns, BLM officials met with EPA officials on

August 15, 2007. At that meeting, the EPA expressed concern that "it would be difficult

and expensive to prepare and install an appropriate liner in the canyon area that is part of

the land exchange proposal." *AR* 597. EPA officials indicated that Simplot told them

that an expert in liner application – a Dr. Weisa – had toured the canyon site recently and

"believes that by reworking of the canyon walls, Simplot could install an HDPE liner."

*Id*. EPA officials expressed their concern to the BLM "about the cost of reworking the

canyon to an amenable configuration for liner installation" and the "difficult logistics of

canyon construction," all of which might lead Simplot to "do something [that] will end up

inadequate." *Id.*

About four months later, in December of 2007, the BLM issued its final EA and

Finding of No Significant Impact (FONSI). The BLM determined that because it was

reasonably foreseeable that Simplot would build a gyp-stack on the selected land, the EA

contained a discussion of the expected impacts of a future gyp-stack. *AR* 335-341. The

BLM did not, however, have any gyp-stack plan from Simplot and so had nothing

specific to evaluate. The EA notes that "[t]he direct impacts the construction of the gypsum stack might cause are not possible to determine at this time as there are no design or development plans for the expansion of operations associated with the selected lands." *AR* 331. At another point, the EA notes that "it is impossible at this time to assess specific future environmental effects of any potential development," and therefore explains future effects only "in general terms." *AR* 334.

In that general discussion, the EA noted that "[i]t is possible that placement of a new gyp-stack . . . could result in additional impacts to those already existent at the EMF site if the design, construction, operation, final reclamation, and closure of the stack are not carefully assessed and implemented." *AR* 337. The EA noted that phosphogypsum waste had been exempted from two of the laws that otherwise would have regulated its disposal, the Resource Conservation and Recovery Act (RCRA) and the Idaho Solid Waste Management Rule. *Id*. But the EA pointed out that the waste was regulated under other laws, including the CERCLA laws governing the EMF Site, the Clean Water Act, and the Clean Air Act. *Id*.

To predict how a future waste site might be regulated, the EA examined the Agrium gyp-stack, recently constructed about 60 miles east of the Simplot plant. The EA depicts the Agrium example as a success story, noting that Agrium's plan to protect the environment – including the use of a triple-layer liner – was reviewed and approved by the Idaho Department of Environmental Quality (IDEQ). *AR* 338. Pointing to the successful use of liners for gyp-stacks in Florida, the EA observed that "[l]iner

technology for gyp-stacks is fairly mature and has proven to work well." *AR* 339. The EA cited a Simplot letter in which Simplot committed to installing a liner if it decided to use the BLM land for a new gyp-stack. The EPA concluded that "it is almost certain that a liner would be proposed and required." *Id.*

The EA noted "challenges" in designing and installing a liner at that site given the steep "topography that leads into a canyon in the foothills above [Simplot's] existing gyp-stack." *Id.* In this discussion, the EA says nothing about the EPA having raised concerns – recounted above – that placing a liner in the steep canyon terrain may not only be expensive but also difficult logistically. *AR* 597. Instead, without citing any specific supporting authority, the BLM simply concludes that "standard industry practices employed in gyp-stack mining tailings pond and landfill design and operation appear to indicate that this could be practically accomplished but likely at somewhat higher cost than gyp-stack on flat ground." *Id.*

The EA also considered the stability of a large gyp-stack. The EA points to a 2002 study of the existing gyp-stack concluding that it was "likely not to be susceptible to liquefaction (failure and slide) under the maximum seismic loading conditions expected for the Pocatello region." *Id*. A new gyp-stack on the BLM lands was "expected to be comparable since the stack would be constructed in a similar fashion with similar materials. Failure of a new gyp-stack would not be expected to occur if proper engineering design including internal water drainage provisions is conducted." *Id*. After talking with agency officials in Wyoming and Florida who regulated gyp-stacks, the

BLM was convinced that liners would prevent all but a "very small" amount of toxins to enter the groundwater.

In addressing the cumulative impact of these concerns, the EA stated that "[t]he greater surface area of a new stack, combined with the existing gyp-stacks would tend to combine to increase these impacts [to surface water and air quality] in an additive fashion." *Id*. at 341. Nevertheless, the EA concludes that "the cumulative effect is anticipated to be essentially no greater than the existing conditions." *Id*.

In the FONSI, the BLM decided to proceed with the land exchange. In making that decision, the BLM stated that Simplot "has indicated . . . that they anticipate the need to construct a new phosphate disposal facility (gypsum stack) and would build it on the Federal lands at some point after the exchange is completed." *AR* 308. With regard to the selected lands, the BLM found that any future gyp-stack would be regulated by, among others, the EPA and the IDEQ. *AR* 308.

That prediction was accurate. In 2010, the EPA issued an amended ROD, and Simplot agreed to implement various aspects of that amended ROD. Part of that agreement states as follows:

> New gypsum stack. If Simplot plans to construct a new gypsum stack that has the potential to impact the CERCLA remedy, Simplot shall notify EPA at least 180 days prior to beginning such construction. With that notification, Simplot shall provide to EPA the new gypsum stack design, including liner design, a siting evaluation report, a background water quality investigation, a groundwater monitoring program, a corrective action plan in the event of liner failure, and proposed construction schedule.

*See Statement of Work (Appendix E to Exhibit A to Prouty Declaration)* at p. 7.

In addition, the IDEQ entered into an agreement with Simplot on April 11, 2008, regarding the building of any new gyp-stack at the plant:

> Any new gypsum storage/stack built at the Don Plant, including any gypsum stack built on any new land to be acquired for this purpose, shall include a liner in its design, a siting evaluation report, a background water quality investigation, a groundwater monitoring program, and a corrective action plan in the event of liner failure. The design and supporting documentation, operation, and maintenance procedures, final reclamation plans, and closure plans for any new gypsum stack shall be approved by the Department prior to the start of construction.

*AR* 529.

The Tribes protested the FONSI to the Pocatello Field Office of the BLM. On December 21, 2007, the Tribes' protest was denied. The Tribes appealed that decision, but on June 5, 2009, the Interior Board of Land Appeals affirmed the decision of the Pocatello Field Office.

The Tribes responded by filing this lawsuit against the BLM, alleging, among other things, that the BLM was obligated to prepare an Environmental Impact Statement (EIS) under NEPA. On March 16, 2010, Simplot was granted leave to intervene. All parties then filed motions for summary judgment that are now at issue before the Court.

## STANDARD OF REVIEW

The Court's review of the Tribes's NEPA claim is governed by the Administrative Procedures Act (APA). *See Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549 (9th Cir. 2006). Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).

Review under the arbitrary and capricious standard is narrow and the Court cannot substitute its judgment for that of the agency. *Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010). A decision is arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id*. Agency action is valid if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.*

Moreover, the Court must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *Id*. The Court cannot act as a scientific expert "instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Id.* When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if the Court might disagree. *Id.*

## ANALYSIS

NEPA requires that an environmental impact statement (EIS) must be prepared for every "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). However, if, as here, an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an

Environmental Assessment (EA) to determine whether the action will have a significant effect on the environment. *See* 40 C.F.R. § 1501.4. If the EA establishes that the agency's action may have a significant effect upon the environment, an EIS must be prepared. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998). If not, the agency must issue a Finding of No Significant Impact (FONSI), *see* 40 C.F.R. §§ 1501.4, 1508.9, accompanied by "a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains*, 161 F.3d at 1212.

NEPA regulations guide the inquiry into whether the land exchange at issue here may have a significant impact. Those regulations, promulgated by the Council on Environmental Quality ("CEQ"), require consideration of two broad factors: "context and intensity." *See* 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C). Context refers to the setting in which the proposed action takes place. *Id*. at § 1508.27(a). Intensity means "the severity of the impact," and involves examining the proposal's public health risks, its relationship to other actions, its effect on ecologically critical areas, and the degree to which its effects are highly uncertain or involve unique or unknown risks, among other factors. *Id*. at § 1508.27(b). The Circuit has held that any one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. U.S. Army Corp of Engineers*, 402 F.3d 846 (9th Cir. 2005).

The Court will turn to examine the EA's evaluation of the intensity of the impact, and specifically its analysis of the cumulative impact factor.

## Cumulative Impact

An important factor in determining intensity is "whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *See* 40 C.F.R. § 1508.27(b)(7). A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other . . . reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7.

This factor evaluates the impact of the land exchange itself together with the impact of "reasonably foreseeable future actions." In determining whether the building of a gyp-stack on the selected lands was a "reasonably foreseeable future action," the BLM had a substantial past record to draw upon. For years, Simplot told the BLM that it wanted to place a gyp-stack on the selected land. Simplot even detailed the location – the canyon in the craggy terrain of section 19 – and discussed plans to begin the waste storage at the mouth of the canyon's north end and progress up the canyon (moving in a southerly direction) over its years of operation. Confirming Simplot's continued desire to use this land for a gyp-stack is information, conveyed by the EPA to the BLM, that Simplot had hired a liner consultant who concluded that the canyon walls could be "reworked" to allow a liner to operate effectively there.

These circumstances demonstrate that it was "reasonably foreseeable" that Simplot would build a new gyp-stack on the selected lands, and the FONSI so recognized. *AR* 308 ("Simplot has indicated to the BLM that they anticipate the need to construct a new phosphate disposal facility (gypsum stack) and would build it on the Federal lands at

some point after the exchange is completed").[1]  Thus, the BLM's EA was required to

evaluate the environmental impacts of a new gyp-stack on the selected lands.

An EA's analysis of cumulative impacts "must give a sufficiently detailed

catalogue of past, present, and future projects, and provide adequate analysis about how

these projects, and differences between the projects, are thought to have impacted the

environment."  *Te-moak Tribe of Western Shoshone of Nevada v. U.S.*, 608 F.3d 592, 602

(9th Cir. 2010).  "General statements about 'possible effects' and 'some risk' do not

constitute a 'hard look' absent a justification regarding why more definitive information

could not be provided."  *Id.*  "[S]ome quantified or detailed information is required.

Without such information, neither the courts nor the public ... can be assured that the

[agency] provided the hard look that it is required to provide."  *Id.*  This cumulative

analysis "must be more than perfunctory; it must provide a useful analysis of the

cumulative impacts of past, present, and future projects."  *Ocean Advocates v. U.S. Army

Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005).

Here, the EA's analysis of the impact of a new gyp-stack was quite general in

nature.  Indeed, the EA concedes that due to the lack of a Simplot plan, "the possible

effects of future development are explained in general terms in this section."  *AR* 334.

Without a plan to evaluate, the EA could not discuss – much less answer – basic

_____

[1]  Determining whether an action is a "reasonably foreseeable future action" is "a task assigned to the special competency of the appropriate agenc[y]."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998).  Here, the BLM found the new gyp-stack's placement on the selected lands to be a "reasonably foreseeable future action."

questions about a gyp-stack's impacts: (1) How much waste would be stored in the canyon? (2) How would the canyon would be prepared for storage? (3) What type of liner would be used? (4) How would the liner be installed in the canyon terrain? and (5) What are the groundwater flows under the canyon that might add to the existing contamination?

Without answers to such basic questions, the conclusions that were drawn by the EA on the cumulative impacts of the gyp-stack are so perfunctory as to be meaningless. That is precisely the type of cumulative impact analysis that fails to meet the "hard look" standard according to *Te-moak Tribe* and *Ocean Advocates*, discussed above.

The lack of a Simplot plan does not justify a general analysis. Here, it prevented the level of detail in the cumulative impact analysis that would "assure [the Court] that the [agency] provided the hard look that it is required to provide." *Te-moak Tribe,* 608 F.3d at 602. In addition, it results in substantial uncertainties about the true environmental impacts, creating a problem with another intensity factor known as the uncertainty factor.

## **Uncertainty**

A project may have significant environmental impacts where its effects are "highly uncertain or involve unique or unknown risks." *See* 40 C.F.R. § 1508.27(b)(5). Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential effects. *Native Ecosystems Council v. U.S.*, 428 F.3d 1233, 1240 (9th Cir. 2005). The purpose of an EIS is to obviate the need for speculation by insuring that

available data are gathered and analyzed prior to the implementation of the proposed action. *Id.*

This case is filled with uncertainty. For example, about four months before the FONSI issued, the EPA told the BLM about Simplot's plan to use a liner in the craggy terrain of the canyon, and expressed concern about both the expense and logistical difficulty of such a plan. Yet, the EA and FONSI say nothing about the EPA expressing those concerns. While the EA notes that there would be "challenges" in installing a liner in that canyon terrain, it waves them off with a vague reference to "standard industry practices," without ever discussing those practices.

There are also substantial uncertainties about groundwater flows and potential contamination. The EA revealed that although the groundwater under the EMF Site area had been extensively studied, the selected lands were in a different hydrogeologic area that had not been studied. *AR* 324. For that reason, the EA explained, "groundwater studies have not been done." *Id*. This uncertainty is especially troubling given the existing contamination and the difficulties in remediation, all discussed above.

All of these circumstances demonstrate (1) that the environmental effects of building a new gyp-stack on the selected lands were highly uncertain, and (2) that the collection of more data on how the waste would be stored and its effect on groundwater might resolve the uncertainty. This is sufficient to require the preparation of an EIS. *Native Ecosystems Council,* 428 F.3d at 1240 (holding that preparation of an EIS is mandated in the face of highly uncertain effects where uncertainty may be resolved by

further collection of data, or where the collection of such data may prevent speculation on potential effects); *Anderson v. Evans*, 314 F.3d 1006, 1021 (9th Cir. 2002) (holding that substantial questions about one of the intensity factors was sufficient to require EIS).

## Ecologically Critical Areas

In addition to uncertainty, another important factor in determining whether an EIS is required is the "unique characteristics of the geographic area such as proximity to . . . ecologically critical areas." *See* 40 C.F.R. § 1508.27(b)(3). Here, the selected lands were within, or adjoining, the EMF Site, an area contaminated by the very same waste to be stored in the new gyp-stack. The EMF Site is clearly an "ecologically critical area." The proximity of any new gyp-stack to the EMF Site triggers application of § 1508.27(b)(3).

## Controversy

Finally, the degree to which the effects on the "quality of the human environment are likely to be highly controversial" is a factor in determining intensity. *See* 40 C.F.R. § 1508.27. The controversy must be over the environmental effects and is not created by mere opposition or political protest. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 US 76 (1983). Here, the Portneuf River, that passes through the Bottoms area where many of the Tribes' traditional and ceremonial activities are centered, has been contaminated by phosphorus leaching from the EMF Site. As discussed above, there are substantial uncertainties about the environmental effects of adding more waste storage to the area. The Tribes are not just raising a politically-based opposition but are relying on (1) solid environmental data from the EMF Site contamination and (2)

**Memorandum Decision - 20**

uncertainties surrounding any new gyp-stack. The Tribes have shown that this factor weighs in favor of a finding of intensity.

## Conclusion on Intensity

The intensity factors of cumulative impact, uncertainty, impact on ecologically critical areas, and controversy all weigh in favor of preparing an EIS. Any one of these factors could compel a finding that the impact is severe and that an EIS is required, and the presence of multiple factors all pointing in the same direction mandates that result. *Native Ecosystems Council,* 428 F.3d at 1240 (holding that preparation of an EIS is mandated due to highly uncertain effects); *Anderson,* 314 F.3d at 1021 (holding that substantial questions about one of the intensity factors was sufficient to require EIS).

## Effect of EPA and IDEQ Agreements

Simplot and the BLM point out that since the EA and FONSI issued, the EPA and the IDEQ have entered into agreements with Simplot to oversee any construction of a gyp-stack. The Court recounted these agreements above. The BLM and Simplot argue that these agreements ensure that all interests will be protected and that no EIS is required.

The Court disagrees. These agreements are no substitute for an EIS. Neither Simplot nor the BLM claim that the agreements will allow the Tribes the full rights of participation and comment that they are entitled to in the EIS process under NEPA. The purpose of NEPA is to ensure "that the agency will have and will consider detailed information concerning significant environmental impacts, and . . . that the public can

both contribute to that body of information and can access the information that is made public." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016, 1034 (9th Cir. 2006). This "ensures that federal agencies are informed of environmental consequences *before making decisions . . . .*" *Citizens for Better Forestry v. United States*, 341 F.3d 961, 970 (9th Cir. 2003) (emphasis added).

It is through the NEPA process that the Tribes, and other interested members of the public, will not only be informed but also be heard. Those rights are especially important given the BLM's obligation, which it recognized in the EA, to ensure that any land exchange is "closely coordinated with the Tribes." *AR* 317.

Accordingly, the Court rejects the argument that the EPA and IDEQ agreements relieve the BLM of the duty of preparing an EIS under NEPA.

**Conclusion**

The Tribes "need not show that significant effects will in fact occur," but if they raise "substantial questions whether a project may have a significant effect, an EIS must be prepared." *California Wilderness Coalition v. U.S.*, 631 F.3d 1072, 1097 (9th Cir. 2011). This is a "low standard." *Id.* The Tribes have met that standard, and hence are entitled to a summary judgment that the EA violates NEPA and the BLM is required to prepare an EIS. Because the Court decided the pending motions under NEPA, the Court finds no need to resolve the other issues raised by the Tribes under FLPMA and the trust obligations.

The Court will issue a separate Judgment as required by Rule of Civil Procedure

58(a).



DATED: **May 3, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge